22 So.2d 29

### BLACKMON v. STATE.

8 Div. 280.

Supreme Court of Alabama.

April 19, 1945.

Rehearing Denied May 17, 1945.

Joe Starnes, of Guntersville, for appellant.

Wm. N. McQueen, Acting Atty. Gen., and Forman Smith, Asst. Atty. Gen., for the State.

THOMAS, Justice.

The appeal is from a conviction for murder in the first degree and the imposition of the punishment of life imprisonment.

The body of W. M. Coleman, the policeman for the Town of Arab, on August 14, 1943, was found lying on the sidewalk, several bullet wounds having been inflicted thereon, any one of which was capable of producing death. Several members of the Blackmon family were arrested, and indicted, for the alleged murder, viz: Ben, Tempie and Chris Blackmon.

Chris Blackmon, who had left Marshall County many years before for a distant state, was visiting in the county prior to and at the time of the killing. In his testimony he said that in the early morning hours of the date named, he left the county by way of Huntsville for Memphis, Tenn., where he was apprehended. After his indictment for murder in the first degree, he became a witness for the state in connection with the death by homicide of Coleman, and his testimony tended to implicate defendant Ben Blackmon and his wife Tempie. The rules of conspiracy in the commission of a crime and of corroboration testimony of a conspirator need not be repeated. Code 1940, Tit. 14, § 99;

Clark v. State, 240 Ala. 65, 197 So. 23; Abingdon Mills v. Grogan, 167 Ala. 146, 52 So. 596. And evidence tending to show motive on the part of either conspirator to consummate the crime is admissible against both. Stone v. State, 105 Ala. 60, 17 So. 114.

The recent authorities dealing with statutes requiring special venires in capital prosecutions including persons drawn on regular juries for the week or order for special venire were considered in Smallwood v. State, 235 Ala. 425, 179 So. 217.

In Stinson v. State, 223 Ala. 327, 135 So. 571, it was declared that statutes permitting courts to excuse prospective jurors cannot be construed as modifying statutes requiring the court to order venire in capital cases; that they may be summoned to appear and examined as to their qualifications. And in Dodd v. State, 241 Ala. 152, 1 So.2d 671, the Smallwood case, supra, was referred to and the reason for the rule that obtains stated to be that it was in order that the defendant may know of the exemptions claimed by the prospective juror, and the grounds on which the court acted in excusing a juror from serving.

■ On the point at issue, it is noted that the general provisions of the Code 1940, Tit. 30, § 5, are that the court may excuse from service any person summoned as a juror if he is disqualified or exempt, or for any other reasonable and proper cause, to be determined by the court. We have indicated that in capital cases the qualifications must be determined on the day of the trial so that a defendant may protect his interest by proper exception, if he desires to reserve the same. The effect of the decision in White v. State, 201 Ala. 387, 78 So. 449, and authorities there collected, is that the trial court was authorized at the proper time to hear excuses of jurors and in its discretion to excuse jurors "for reasonable and proper cause." Letson v. State, 215 Ala. 229, 110 So. 21.

The appellant's insistences of error as to the several jurors may be stated as follows: "The trial Court erred when it excused the regular juror, Will H. Wright, and special jurors, A. C. Simmons, Edgar King and Simp Seibold, over the objection and exception of the defendant. The record should affirmatively show that a juror is disqualified or exempt or that other reasonable or proper causes existed before excusing jurors over the objection and exception of the defendant in a capital case. The Court's exercise of discretion in excusing jurors from duty in the trial of a capital case must be founded within reason, justice, and in consonance with the defendant's constitutional rights. The Court does not have the right to excuse a regular or special juror from service in a capital case capriciously, or for no reason at all."

■ Looking to the record, it was determined at the trial that, the regular juror Wright was engaged in government work. Special juror Simmons was actually engaged in mending and repairing airplane tires used by the government, and was known as a "goverment worker." For that reason he was excused. Special juror Edgar King was excused because he was employed at the Huntsville Arsenal and all know that is war work. The court stated that special juror Seibold was a veterinarian and meat inspector for the government, and he had some meat to inspect. For that reason he was excused.

During the process of qualifying jurors in panels of twelve, counsel for defendant stated to the court that it was the duty of the court to ask a juror to "stand aside" when he stated he had a fixed opinion. The court replied, "I think it is a matter for challenge." Exception being reserved, the court said, "Karl Medlock will stand aside for his stated fixed opinion." Defendant's counsel objected to juror Daney Pope McLendon going on the jury because of a mistake in the spelling of his first name. The court permitted said juror to stand aside for the instant case, even though he was on the regular jury.

In the foregoing rulings of the court, touching qualifications of regular and special jurors, there was no error. Such rulings were not capricious or arbitrary, but were within the sound discretion to be exercised by the trial court.

■ Exception was reserved and urged in argument as reversible error relative to the question that the wife and daughter of deceased be excused from the rule. Whereupon the defendant's attorney requested that the wife and son of defendant Ben Blackmon be excused. One of the attorneys for the state then stated, "No, they were eye witnesses." To this observation, objection and motion to exclude were made, as being highly prejudicial to defendant. The court ruled as follows: "Gentlemen of the Jury, you will have to determine who were the eye witnesses."

Any statement "made by either side as to who saw or did not see it should have no effect on you. You will find from the stand who the witnesses were." In this action of the court there was no error. This was before any testimony had been introduced and directed to the court on which it could exercise a reasonable discretion in excusing interested parties from the rule. It will be noted that the expression contained in Dunmore v. State, 115 Ala. 69, 22 So. 541, was without the testimony, being discussed in argument of counsel, where the improper remarks were held to be reversible error.

■ Defendant objected to questions propounded to witness Carter, moved to exclude the answers relating to the habit and custom of deceased in the way he carried his pistol, the kind it was, and the way it was loaded. However, this witness disclosed a personal knowledge of deceased's pistol. His testimony corroborated witness C. C. Blackmon, who testified as to appellant's possession of deceased's cap and pistol immediately after the shooting. The question propounded to C. C. Blackmon was, "Tell us what was said in that conversation" (between C. C. Blackmon and witness while in jail), and he said, "I asked Ben this question, 'What had me puzzled is why you would bring the cap and gun away in the first place,' and he said, 'When you handle things, you leave finger prints', that is the way he said it." The witness Blackmon testified as to defendant having the pistol and cap immediately after the shooting of deceased and giving it to him with direction by defendant to take the "stuff and wait up there and we will pick you up when we come." Ben said, "You keep this stuff. No telling who will be there and I don't want them to see it. Ben's wife handed me the two guns, pistols, and the policeman's cap." Further, that Ben came for him, Glenn was driving Ben's car, and Will Knight was in the back seat. That witness concluded by saying, "I went around back of the car and got in, threw the cap on the floor board and the gun in the seat. Ben came up to the driver's side of the car and told Glenn, 'Be damn sure you get rid of all of that stuff.' * * *."

The testimony of Carter was material as it tended to connect the defendant with Chris Blackmon's possession of deceased's property. The fact that at this point in the evidence there was no positive identification of either the pistol or the cap which Coleman had and wore the night he was killed merely goes to the weight of the evidence and not its admissibility. In this jurisdiction the possession by the accused of property belonging to the deceased or property of similar character and kind is admissible in prosecutions for homicide. Pope v. State, 168 Ala. 33, 53 So. 292; S. C., 188 Ala. 50, 66 So. 25; Braham v. State, 143 Ala. 28, 38 So. 919; Saulsberry v. State, 178 Ala. 16, 59 So. 476.

■ A witness had been qualified as an expert in the science of ballistics and wounds in the human body and death inflicted by fire arms, and he was asked how the wound on the body of deceased was made, as compared with the holes in the garment the deceased wore when killed. That his answer may have been a conclusion is immaterial, for all expert opinions are conclusions drawn in the light of experience as to the particular facts involved. However, as we understand the record, no specific objection or exception was interposed, and the question was not subject to a general objection. In the admission of such evidence, the trial court was without error. Karr v. State, 106 Ala. 1, 7 and 8, 17 So. 328; Southern Ry. Co. v. Montgomery, 229 Ala. 456, 157 So. 854; Birmingham Baptist Hospital v. Blackwell, 221 Ala. 225, 128 So. 389.

■ The record shows objections in rulings on questions propounded to Sheriff Boyles and his answers with reference to the recent car tracks from Arab to the Blackmon home and those made in the road near the home of defendant. It is insisted that these car tracks near Arab and those along the route to the Blackmon's home at points near the home on the night of the homicide were not properly connected with the defendant's car. The description given of such tracks was that two tires were irregular, one on the left back wheel and one on the right front wheel; that they had "the same print," and the other two tires were regular. The witness stated that the tracks he saw near Ben Blackmon's yard compared with the tracks he had seen and testified about in the road, and "appeared to be the same car tracks." The record recites that the defendant objected, was overruled, and excepted. In this ruling there was no error as the testimony presented a question for the jury.

The witness further testified that they reached Ben Blackmon's house between 2:30 and 3:30 A. M., on the night of the homicide; that Ben had on a shirt and

overalls and was barefooted and Mrs. Blackmon appeared to be fully dressed. She admitted this fact as a witness. He found a pistol. The witness Boyles further testified that no promise, threats, offer of reward or immunity were made at such time and place to the husband or wife, Ben and Tempie Blackmon, to get them to talk.

■ The testimony as to tracing the automobile tracks, with their distinguishing marks along the way from the scene of the homicide to defendant Blackmon's house immediately after the homicide, was material and admissible, tending to corroborate the testimony of Chris C. Blackmon, who was indicted for the same homicide and testified as a state witness. Moss v. State, 152 Ala. 30, 44 So. 598. The weight of such testimony was for the jury. Baugh v. State, 218 Ala. 87, 117 So. 426.

■ As the court excluded all of the testimony relating to the barefoot tracks made by Ben Blackmon at his home when visited by the sheriff the night of the homicide, it is unnecessary to state the substance of such evidence. Suffice it to say that in this ruling of the court no error intervened to reverse the judgment of the court.

When defendant Blackmon was put on the stand as a witness in his own behalf, he admitted that the sheriff and another came to his house at the time indicated, and stated what occurred as to the tracks in question. Defendant said that Mr. Boyles and the highway patrolman were out there at the edge of the yard with a flashlight and that he got his breeches on and went where he was. Mr. Boyles told Blackmon that Mr. Coleman had been killed and they went on into the Blackmon house. There followed a resume of the evidence as to the barefoot tracks, which, as we have indicated, was excluded without error.

■ The testimony of the witness Houston King, a policeman for the town of Arab, was competent, as tending to identify Ben Blackmon's car on the night of the killing in that town. Though the car was not positively identified, the evidence was admissible as tending to establish the presence of appellant at the scene of the crime the night of and immediately before the killing of Coleman. The evidence went to the jury who drew the conclusion as to its weight. There was other evidence of defendant being in Arab earlier in the day, inquiring and looking for deceased, and purchasing a pistol from Briscoe.

■ The witness Gaines Brown testified that he asked Ben Blackmon what he was going to do with a gun, and the answer was, "I don't know, I may have to use it." The witness had stated that he went to Ben Blackmon's on the day Coleman was killed "that night" between 6:30 and 7 o'clock; that he was sitting in the house and Ben Blackmon was cleaning a gun, had cartridges that he was doing something with, maybe "sharpening them off; trimming them with a knife." Witness's best recollection was that he asked Ben what he was going to do with it, and the reply was, "I might have to use it." Defendant's objection to this question was overruled, defendant reserving an exception, and the witness answered, "Might have been talking then, but I am swearing now." Another objection, and the court asked, "Do you remember anything being said?" The witness answered, "I think in substance, I asked Ben, 'What are you doing with that gun, boy?' and he said, 'I don't know, I might have to use it.'" The court overruled the objection, and left the testimony in. The defendant's counsel replied, "We except." The witness further answered, "For all I know, he might have been going rabbit hunting." There was no reversible error committed in the court's ruling as to such evidence. The jury were to judge the weight and credibility to be given such testimony.

■ We find colloquy of special counsel for the state and the defense in the record assigned as error. In this we find nothing to reverse.

The record shows that an effort was made on the trial by Ben Blackmon, his wife Tempie, and his son Glenn, to charge Chris Blackmon, the state's witness, with the homicide. All of the evidence shows the anger of defendant and his wife at what they considered an unjust attack on their son Glenn by the deceased.

■ We have indicated that the peculiar automobile tire tracks were followed by the sheriff along the way witness Chris Blackmon described; that they were readily distinguishable by the unusual print on the front and back tires; that such easily discerned tracks led to the defendant's house. When the sheriff was at the defendant's house the night of the homicide, defendant's automobile was not there. The evidence fully shows that defendant's son

Glenn, in accordance with instructions from his father, had taken the Blackmon car; that he went about in it delivering messages to kinsmen, and took the witness Chris Blackmon to Huntsville to catch a train for a distant state, and while en route to Huntsville, disposed of the pistol and cap in question. The rule of suppression of evidence in this jurisdiction is well understood, and given expression in Drummond v. Drummond, 212 Ala. 242, 102 So. 112.

The subsequent acts of the Blackmons, defendant and son, during the night of the homicide, the flight by way of Huntsville of Chris Blackmon, the disposition of the 32 pistol (deceased was killed with a 32) at or near the well in the Blackmon's yard, the disposition of the 38 pistol and deceased's cap on the way to Huntsville by Ben's son as instructed by his father, and the use of defendant's car on such trip were corroboration of the testimony of Chris Blackmon, and presented a reasonable inference of Ben Blackmon's guilt for the jury. The same may be said of the further fact that when the sheriff found Ben and his wife immediately after the homicide, Tempie was fully dressed, notwithstanding the claim that she often slept in her dress, and her explanation that she dressed when they went out to the barn to see about the mules.

The defendant, his wife and son voluntarily made statements of material matters to the officers of the law, affording an adverse inference, when judging their testimony as to denial of commission of the crime and the effort to place responsibility therefor on the nonresident nephew, who had come from Memphis to their home with his two children, on a visit to his parents.

The jury had the right to look to these contradictions in their testimony and to weigh the same under the rule falsus in uno, falsus in omnibus.

It is not necessary to recite in detail the testimony of other disinterested witnesses, for instance, the testimony of Bill Green, Hinson and "Matt", relative to Ben Blackmon hunting for Coleman after the policeman had beaten up his son Glenn; that he appeared to be angry with Coleman and hunting trouble with him; that he went to Doug Briscoe's home where he purchased a pistol. There is ample evidence of his motive, preparation and proximity as to time and place for the commission of the crime.

Distinguished counsel for defendant do not indicate that reversible error intervened in the instructions to the jury. We have carefully examined the record, as it is our duty to do, and in the clear and concise charge of the trial court, and instructions by way of given charges, no reversible error intervened. Neither was there error in the refusal of defendant's requested charges.

We have carefully considered the conduct and testimony of the officials who investigated this homicide and find no reversible error was committed on the trial in the admission or rejection of their testimony touching the conduct of such officials during the investigation of the crime. We have examined the decisions cited by appellant's counsel, People v. Knapp, 42 Mich. 267, 270, 3 N.W. 927, 36 Am.Rep. 438, where the officer remained with the jury; and Heldt v. State, 20 Neb. 492, 30 N.W. 626, 57 Am.Rep. 835, where a confession was obtained by falsehood or securing the confidence of defendant for obtaining a confession, and find nothing in the conduct of the instant officers to bring the instant case within the rule announced in the Michigan and Nebraska cases, under the rules that obtain in this jurisdiction.

Had it not been for the prompt and efficient action of the sheriff and his assistants, this crime might not have been uncovered. The jury had the right to duly regard the acts of the officials in the line of their duty, and counsel had the right to duly comment on the testimony of such investigating officials in the light of their duty and zeal, or the lack thereof, as exhibited by the evidence, within the rules that obtain.

We have carefully examined the very voluminous record and we are of opinion that it is free from error. The preponderance of evidence proved appellant's motive for the killing; his premeditation and preparation to that end; his presence at the time the deceased met his death by gunshot wounds; his threats against the deceased immediately before the killing; his possession of a pistol of the same caliber used to inflict the mortal wound; his efforts to suppress testimony of an important witness by sending him to a distant state; his attempt while in jail to instruct Chris Blackmon to say the killing was by another, as indicated by testimony of Lonnie Sampson, which Chris refused to do; his attempt to form a defense by false evi-

dence, as shown by Sampson and Chris Blackmon and others, and his attempt to establish an alibi, presented to the jury sufficient evidence from which defendant's guilt could be shown to convince them beyond a reasonable doubt.

It results from the foregoing that no reversible error intervened on the trial. The verdict of the jury was in response to reasonable inferences to be drawn from the great weight of the evidence, and the judgment of the court predicated thereon, is free from error and should be affirmed.

Affirmed.

GARDNER, C. J., and FOSTER and STAKELY, JJ., concur.