210 So.2d 826

**Burnist Orville SMITH**

v.

**STATE of Alabama.**

**4 Div. 214.**

Supreme Court of Alabama.

March 14, 1968.

Rehearing Denied May 23, 1968.

John C. Walters and E. C. Orme, Troy, for appellant.

MacDonald Gallion, Atty. Gen., and W. Mark Anderson, III, Asst. Atty. Gen., for the State.

LAWSON, Justice.

A jury of Pike County, Alabama, found Burnist Orville Smith guilty of the first degree murder of Mrs. Foy Post Boone and fixed his punishment at imprisonment for life. Judgment and sentence were in accord with the jury's verdict. Smith has appealed to this court.

Mrs. Boone, eighty-one years of age, lived alone in her home on North Brundidge Street in Troy, Alabama. Around two o'clock on Sunday afternoon, December 15, 1963, Lester Little, who lived in the home of Mrs. Jean Enzor, which was situated next door to Mrs. Boone's home, went to the home of Mrs. Boone "to check the water pipes for her against freezing." He opened the screen door and then pushed open the wooden door which led directly into the living room. He stepped just inside the door and called Mrs. Boone two or three times and then looked to his left and saw Mrs. Boone "laying on the far end of the couch." Little returned to the home of Mrs. Enzor and told her he thought Mrs. Boone was dead. Mrs. Enzor called the police. Mrs. Boone had not been seen by her neighbors since Thursday, December 13, 1963.

Chief of Police Potts and Police Officer Barrow arrived at Mrs. Boone's home at about 2:36 P.M. Pike County Sheriff Davis was called by Chief Potts and he arrived on the scene within a short period of time. Either Chief Potts or Sheriff Davis called the Pike County Coroner, Robert A. McGehee, who was a practicing mortician. McGehee arrived at Mrs. Boone's home shortly after receiving the call

Coroner McGehee testified in substance that when he entered Mrs. Boone's living room, Mrs. Boone "was on the sofa lying with her body, the upper part of her body, on the sofa and her knees were on the floor and her head was turned to her right and her right arm was lying—she was kind of over in this position" (indicating). Mrs. Boone was dead. Her body "was discolored, kind of bluish in some spots, some places a bluish and a deep red color and some scratches or abrasions on the body." A lady's stocking was around her neck, which stocking had been knotted and twisted with a stick. There were marks on her neck under the knotted and twisted stocking. The coroner testified that the death of Mrs. Boone was caused by strangulation.

The shade on the glass part of the front door was pulled down and the shade on the only window which faced the street was pulled down as far as it could go. Pillows had been placed beneath the window shade so that one could not see into the living room from the street or sidewalk.

Mrs. Boone had two diamond rings which she wore at all times. One was a solitaire, a so-called mine cut diamond, which had apparently been given to her by her husband as an engagement ring shortly before 1900. The other was a cluster ring made up of seven smaller diamonds. These rings were not on Mrs. Boone's fingers when her body was found. She also owned a watch which had very small diamonds in it. A search of Mrs. Boone's home failed to disclose the rings or the watch.

Mr. B. J. Gatlin, an Investigator for the Alabama Department of Public Safety, arrived at the Boone residence shortly after

3:00 P.M. December 15, 1963. Mrs. Boone's body had not been removed nor its position altered before Gatlin's arrival. The stick which had been used to tighten the stocking around her neck had slipped out from under her arm. Gatlin took pictures of the body, which pictures were admitted in evidence.

Dr. Paul E. Shoffeit, a toxicologist and Assistant Director of the State Department of Toxicology and Criminal Investigation of the State of Alabama, performed an autopsy on the body of Mrs. Boone on December 16, 1963 at McGehee Funeral Home in Troy. He expressed the opinion that the cause of death "was due to the strangulation as a result of a ligature around the neck." He also expressed the opinion that Mrs. Boone had been dead two or three days before her body was embalmed.

On February 25, 1964, the then Circuit Solicitor of Pike County, now Judge Riley Green, Jr.; Investigator Gatlin; Chief of Police Potts and Sheriff Pressley Davis went to Chattanooga, Tennessee. After they arrived there a Tennessee investigator accompanied them to Quarles Jewelry Store or Shop where Mr. Quarles delivered to them two separate packages of diamonds. One package contained eight diamonds, a solitaire and seven smaller diamonds, and the other package contained twenty-seven very small diamonds. The two packages of diamonds were delivered to them by Mr. Quarles in a box which was in a paper container on which was printed: "F. B. Quarles—Jeweler, 205 James Building, Chattanooga 2, Tenn." Immediately beneath the printing was written, "B. O. Smith, Pleasant Hill, Tennessee."

B. O. Smith was apparently a native of Pleasant Hill, Tennessee, but at the time of Mrs. Boone's death he was living in Troy, Alabama, where he was employed by A. T. Vaughn Jeweler. He had been in Troy since 1962 and lived in a room in the back part of the building occupied by his employer.

A warrant for Smith's arrest was issued on February 27, 1964, but had not been executed prior to five o'clock P.M. of that day, when he complied with the request of Investigator Gatlin to accompany him to the Pike County Courthouse for "the purpose of investigation." Gatlin was later joined by Pike County Solicitor Oliver W. Brantley, who joined in the questioning. The interrogation or questioning ended at the Pike County Courthouse sometime between eight and nine o'clock that night. But Gatlin, Brantley and Smith drove to Montgomery that night and did not return to Troy until the following morning.

Apparently the warrant for Smith's arrest was executed soon after their return to Troy, for he was in jail on March 11, 1964, when he was indicted by a grand jury of Pike County for the first degree murder of Mrs. Boone.

On May 15, 1964, the trial judge ascertained from Smith that he had not employed counsel and was financially unable to do so. Smith was at that time advised by the trial court that counsel would be appointed to represent him prior to June 5, 1964, the day set for arraignment.

On May 22, 1964, in the presence of Smith, the trial court appointed Hon. E. C. Orme and Hon. John C. Walters to represent him. Mr. Orme and Mr. Walters are both able lawyers who have had many years of experience in the trial of criminal cases.

On June 5, 1964, the date set for arraignment, Smith and his court-appointed lawyers were present in open court when one of Smith's lawyers advised the trial court that Smith was not ready for arraignment in that his counsel wished to obtain the report made by Gatlin of his investigation. The trial court declined to

postpone the arraignment. Before pleading to the indictment, counsel for Smith requested that the trial of the case not be set for the week of July 6, 1964. This request was denied by the trial court. Thereupon, Smith and one of his lawyers pleaded Smith not guilty.

On June 26, 1964, Smith's lawyers filed on his behalf eight motions wherein the trial court was requested to order the "State to permit the defendant to inspect, or copy, or photograph the hereinafter described books, papers, documents or tangible objects obtained from defendant, or obtained by others by seizure or process." We will not at this point delineate the articles referred to in the eight motions.

The trial court denied each of the eight motions on June 30, 1964. On the same day counsel for Smith orally moved the court to issue subpoenas duces tecum to the Circuit Solicitor to produce each of the articles enumerated in the eight written motions for inspection by the defendant and his counsel and to enable the trial court to "inspect the matters sought and determine separately and severally the materiality of each either as to guilt or punishment and if the Court finds any of such matters material separately and severally either as to guilt or as to punishment, then the Court permit defendant's counsel to inspect the matters or copy them."

Also, on June 30, 1964, counsel for Smith filed a written motion to suppress certain articles alleged to have been seized under search warrants which warrants, the movant alleged, in effect, were not issued "upon probable cause" and were, therefore, issued contrary to the "4th Amendment to the U. S. Constitution" and contrary to the "14th Amendment to U. S. Constitution" and contrary to "Section 5, Article 1, of Alabama Constitution."

The oral motion or motions for the issuance of subpoenas duces tecum and the written motion to suppress were denied by the trial court on June 30, 1964.

On July 3, 1964, the trial court set aside its order of June 30, 1964, in so far as it denied Smith's motion No. 7, wherein he sought permission to inspect the diamonds which the officials had secured in Chattanooga, Tennessee. The trial court at that time entered an order to the effect that Smith and his counsel be permitted to inspect the said diamonds in the presence of Sheriff Davis, who was in possession of them.

On Monday, July 6, 1964, the day set for the trial of the case, counsel for Smith asked that the case be continued until the following Thursday, which was July 9, 1964. The trial court so ordered.

On Wednesday, July 8, 1964, counsel for Smith moved that the trial of the cause be continued "for a period of three or four weeks." The basis of this request was that counsel needed that much time within which to locate one Fleming or Femming and because counsel had just heard that a resident of Troy by the name of "Bill Walton had stated to the police that he killed Mrs. Boone" and also because counsel for Smith had just heard that "some television man in Troy with a television shop had been working on a television in Mrs. Boon's (sic) about the time that it was alleged to have been a killing, if it was a killing that took place." Counsel for Smith also contended that they had not had time to prepare for the defense of their client. The motion for continuance made on July 8, 1964, was denied by the trial court.

On Thursday, July 9, 1964, the day to which the trial of the cause had been continued, counsel for defendant again moved for a continuance on the ground that they had not had time to prepare adequately their defense. The trial court denied that motion.

The trial began on Thursday, July 9, 1964, and was concluded on Saturday, July

11, 1964. The defendant, Smith, immediately after judgment and sentence gave notice of appeal.

The lawyers who represented Smith in the trial court were appointed to represent him on this appeal. They have filed excellent briefs on his behalf and orally argued the case at time of submission here. Smith has been furnished a record without cost to him.

We have set out above some of the evidence adduced from witnesses called by the State. Before summarizing the other parts of the State's evidence which we deem necessary for an understanding of certain of the rulings of the trial court made during the course of the trial proper, we will deal with the rulings made by the trial court before the trial began on July 9, 1964.

Motions and Requests for Continuances

■ As we have shown, Smith was advised on May 15, 1964, that he would be arraigned on June 5, 1964, and that counsel would be appointed to represent him upon arraignment and at his trial. Counsel was appointed on May 22, 1964, two weeks prior to the date set for arraignment. On June 5, 1964, the day set for arraignment, counsel for Smith advised the court that "We are not ready for arraignment" in that the defense wished to obtain a report made by Investigator Gatlin before pleading to the indictment. As we will hereinafter show, the defense was not entitled to that report. It is true that counsel for a defendant should have ample time to consider what action to take on arraignment. However, the record before us does not show that prejudice resulted from the action of the court refusing to postpone the arraignment.

■ Also, on June 5, 1964, the day set for arraignment, counsel for Smith moved that the trial of the case not be held during the week of July 6, 1964, in that counsel for Smith would not have adequate time in which to prepare the defense. Reversible error is not made to appear in the action of the trial court denying that motion. Peterson v. State, 231 Ala. 625, 166 So. 20; Knight v. State, 273 Ala. 480, 142 So.2d 899.

■ When the case was called for trial on Monday, July 6, 1964, counsel for Smith requested that the trial be continued until Thursday, July 9, 1964. This request was granted. On Wednesday, July 8, 1964, and on July 9, 1964, there were other motions for continuance, the grounds of which were in essence that counsel had not sufficient time in which to prepare and make defense and locate certain persons. Such motions are addressed to the sound discretion of the trial court and the exercise thereof is not subject to review except for gross abuse. Logan v. State, 251 Ala. 441, 37 So.2d 753; Pugh v. State, 247 Ala. 535, 25 So.2d 417; Green v. State, 252 Ala. 513, 41 So.2d 566; Divine v. State, 279 Ala. 291, 184 So.2d 628. A review of the record discloses no abuse of discretion on the part of the trial court in denying the motions or requests for continuance.

Motions to Produce

■ As we have shown above, the trial court ordered, in effect, that Smith and his counsel be permitted to inspect the diamonds which had been obtained from Quarles Jewelry Store or Shop in Chattanooga, which were in possession of Sheriff Davis. The right to inspect the diamonds had been sought in Smith's motion to produce, No. 7. The other seven motions sought, in effect, an order or orders requiring the State to produce for the defendant's inspection:

"All of Investigator Gatlin's notes or memoranda relative to the investigation of, or of this case, that said Investigator

has, or may claim, pertaining to this defendant.

"All reports of Investigator Gatlin to the Circuit or County Solicitor, or to the State Law Enforcement Agency, or to Chief Potts, or to Sheriff Davis.

"All clothes or materials from which the State undertook to or did make or take fingerprints from relating to the investigation of this case;

"All fingerprints made in investigation of this case.

"All recordings, whether tape, record, or otherwise, made of defendant's conversations, or defendant's questioning on Thursday, February 27, 1964, said questioning by Gatlin, Chief Potts and O. W. Brantley; together with questionings that continued into February 28th. Said questionings made in Pike County Courthouse.

"All tape, record or other recordings of conversations of defendant, or defendant's questioning, made Saturday night, February 29, at Pike County Courthouse; wherein Investigator Gatlin, Chief Potts, and O. W. Brantley were present, or questioning him. Being the same night, if the date is incorrect that Gatlin showed defendant two rings or parts of rings, or mountings;

"All other recordings of conversations or statements to any of above parties relative to any investigation of this case;

"Any written statement, or any written note, or any written memoranda, which purports to be memoranda or notes of statements or statement made by this defendant to any of you following, separately and severally: Investigator B. J. Gatlin, Chief Tom Potts, O. W. Brantley, Presley Davis;

"Any letters, writings, communications, from defendant to his wife;

"Any letters, writing, communications from defendant's wife to him;

"Any of the above that were seized under search warrant issued February 27, 1964;

"All other things seized under said search warrant pertaining to this defendant, or pertaining to this case.

"Two rings, or parts of rings, or mountains (sic) placed on table in front of the defendant, by Investigator Gatlin, or by the Chief Potts, or O. W. Brantley, at a questioning of said defendant by said parties, on or about Saturday night after his arrest. Said questioning being in the Pike County Courthouse, and being the first time said parties placed said matters before him."

It is contended by appellant that the trial court erred in not granting to him the relief sought in his motions to produce numbered 1, 2, 3, 4, 5, 6 and 8. Two cases are cited in support of that contention, Brady v. State of Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215, and Smith v. Pennsylvania, 376 U.S. 354, 84 S.Ct. 763, 11 L.Ed.2d 753. We will not discuss the Brady case, supra, in this opinion. It was considered and held not to be controlling in Sanders v. State, 278 Ala. 453, 179 So.2d 35, where a trial court had refused to require the State to produce articles many of which were similar to those which the appellant sought to have the State produce in this case. We do not believe the Smith case, supra, is applicable here. That case is somewhat similar to our case of Parsons v. State, 251 Ala. 467, 38 So.2d 209, where we were concerned with the right of a State court to obtain certain articles and reports in the possession of a United States attorney or agents of the Federal Bureau of Investigation.

In this case the appellant, the defendant below, undertook to have the trial court order the State to deliver statements, articles or information in the possession of its officials simply for use by the defendant below in the preparation of his defense. It does not even appear that the statements,

etc., were sought by the defendant for the purpose of impeachment.

We hold that the trial court did not err to a reversal in refusing to award to the defendant below all of the relief prayed for in his motions to produced numbered 1, 2, 3, 4, 5, 6 and 8. Sanders v. State, supra.

Motion for Subpoenas Duces Tecum

■ What we have said in regard to the Motions to Produce is applicable to the efforts of counsel for Smith to have the trial court issue or order to be issued the subpoenas duces tecum. In refusing the request for the subpoenas duces tecum the trial court did not commit reversible error.

Motion to Suppress

■ Reversible error is not made to appear in the ruling of the trial court denying the motion to suppress.

The motion sought to have the court suppress:

"(a) Rings, or parts or rings, or mountings.

(b) Letters to defendant from his wife;

(c) Letters by defendant to his wife;

(d) Defendant's jewelers tools;

(e) Everything belonging to this defendant seized under search warrant of his automobile, dated February 27, 1964.

(f) Everything belonging to defendant seized under search warrant of the building known as A. T. Vaughn, Jeweler, dated February 27, 1964;

(g) Everything seized by the State or officials thereof, under search warrant of his automobile dated February 27, 1964.

(h) Everything seized by the State, or officials thereof, under search warrant of A. T. Vaughn, Jeweler, 116 North Notch Street, Troy, Alabama, dated Febry. 27, 1964."

Two search warrants were issued by a Justice of the Peace on February 27, 1964. One commanded the Sheriff of Pike County to search Smith's Mercury automobile "for diamond rings or diamond settings the property of Mrs. Foy Post Boone." This warrant was executed by a search of the automobile. But it does not appear that any of the described articles were seized by the Sheriff. The other search warrant commanded the Sheriff to search the building occupied by A. T. Vaughn Jeweler "for diamond rings and diamond ring settings" which were the property of Mrs. Foy Post Boone. As far as this record discloses no search was conducted as authorized by the last-mentioned warrant. The warrants were issued on affidavits made by the Sheriff.

At the hearing on the motion to suppress, one of the lawyers representing Smith, the defendant, simply stated: "In connection with the motion to suppress, we hereby offer in support thereof the original affidavit and search warrant issued on February 27, 1964, as to each search, for they show on the face that they were not issued on probable cause." No other evidence was offered in support of the motion.

Conceding, without deciding the correctness of the position asserted by counsel for Smith, the court's action in denying the motion to suppress would be error without injury in so far as Smith is concerned. The State did not attempt to offer into evidence anything which might have been seized by the Sheriff. In fact, it does not appear from the evidence that the Sheriff seized any of the objects described in the warrants from Smith's automobile or from the premises of his employer, A. T. Vaughn Jeweler. As to the other items sought to be suppressed, for some reason not apparent from the motion to suppress, it is sufficient to say that the State's evidence is to the effect that it did not have in its possession any "rings, or parts of rings, or mountings" other than those dia-

monds received from the jeweler in Chattanooga, which were not obtained as a result of an unlawful search or seizure in so far as this record discloses. The State did have in its possession letters written to Smith by his wife and letters which Smith wrote to his wife. But the evidence shows that those letters were voluntarily delivered by Mrs. Smith to Sheriff Davis in the presence of County Solicitor Brantley early on the morning of March 1, 1964. When they were offered in evidence by the State, counsel for Smith expressly stated that they had no objection to their admission in evidence and they were admitted.

The State introduced evidence of statements made by Smith on four occasions.

B. J. Gatlin, the State Investigator, testified that shortly before five o'clock on the afternoon of February 27, 1964, he asked Smith to accompany him to the Pike County Courthouse "for the purpose of investigation" and that Smith complied with his request. Smith was not placed under arrest at that time.

When the investigation began at the Courthouse no one was present but Gatlin and Smith. However, before the interrogation was concluded Gatlin and Smith were joined by Pike County Solicitor Brantley. The interrogation at the Courthouse ended between eight and nine o'clock P.M. that night. The record indicates that after leaving the Courthouse, Gatlin, Brantley and Smith proceeded to Montgomery and did not return to Troy until the following morning. The purpose of the trip to Montgomery is not disclosed by the record on the main trial. But the appellant, Smith, has brought to this court by certiorari certain papers which, in our opinion, justify a conclusion that the trip to Montgomery was for a purpose other than to continue the interrogation and there is no indication that Smith was subjected to continuous interrogation or, in fact, was interrogated by Gatlin and Brantley while they were in Montgomery.

Gatlin testified that neither he nor anyone in his presence made any threats against Smith or promised him any reward or hope of leniency or offered him any inducement to get him to make a statement.

During the interrogation Smith was not represented by a lawyer although he was told he was entitled to one. He did not say that he wanted a lawyer at that time, but did say that he had only two dollars and wanted a lawyer before he was put to trial. He was assured by Mr. Brantley that if he was unable to employ a lawyer, a lawyer would be appointed by the court to represent him at a trial.

A warrant for Smith's arrest had been issued prior to the time Gatlin requested him to go to the Courthouse for questioning. Gatlin had the warrant in his possession but had not executed it. During the questioning Gatlin advised Smith that the warrant had been issued "for his arrest for murder."

During the course of the interrogation Smith stated that he came from Pleasant Hill, Tennessee, but had been working for Mr. Vaughn in Troy since 1962. Smith first stated that he had not sent any diamonds "to any place for repairs or settings." But later Smith said he might be in trouble; that he had bought some diamonds "from a man on the street whom he did not know"; that he made the purchase near McLeod's Drug Store in Troy on Saturday morning, December 14, 1963; that the diamonds were "loose" in a small bottle; that the unidentified man said he was broke and would sell the diamonds "at a bargain"; that he, Smith, offered the man $100 for the diamonds and his offer was accepted. Smith said he then went to a bank and borrowed $100; that he lied to the bank official in that he told him he needed some "Christmas money"; that while he was in the bank "he deposited a portion of his check" and after leaving the bank he delivered to the unidentified man five twenty-dollar bills and the man walked off. Gatlin later gave a somewhat differ-

ent version of what Smith told him in regard to his trip to the bank, saying that Smith told him: "* * * that he went inside the bank and cashed his check, walked back to the front door and seen that the subject was still standing there at the front of the bank; that he went back to Mr. Murphy's office and he borrowed a hundred dollars from him; and he stated to me that he had told Mr. Murphy a lie about it, that he wanted the money for Christmas and that Mr. Murphy gave him a deposit slip for a hundred dollars; and that he went back to the teller's cage and deposited a portion of his check that he had cashed to meet the upcoming bills." Smith gave a description of the man from whom he said he obtained the diamonds but stated that he did not know him and had never seen him before or since, although the alleged seller of the diamonds knew that Smith was "a jewelry man."

Smith told Gatlin that he kept the diamonds for three weeks because he had heard of Mrs. Boone's death and was afraid that they might have some connection with her death. He first told Gatlin that he heard of Mrs. Boone's death on Sunday morning, December 15, 1963. He later said in the same conversation that he did not hear of Mrs. Boone's death until 4:30 P.M. December 15, 1963, when one Herman Youngblood told him in the Varsity Grill that Mrs. Boone was dead; that she had been "killed and murdered with a silk stocking by strangulation" and that "she was missing two diamond rings." Smith further said that on the same occasion Youngblood told him "that he [Youngblood] said that he noticed the papers piling up on her porch and that he went and got a neighbor to go check and this neighbor found Mrs. Boone dead in her residence."

Smith told Gatlin that when he decided to dispose of the diamonds he wrote his wife at Pleasant Hill, Tennessee, advising her that he had sent certain diamonds to St. Louis Refining Company and had advised that company that if they wanted to purchase the diamonds to send the check to her. He further advised his wife if that company sent a check in the sum of $600 to accept it. St. Louis Refining Company did not send a check in that amount. The first check sent Smith's wife by that company was in the sum of $170, which she returned. She also returned the next check sent to her, which was in the amount of $207. Thereafter the diamonds were sent to Mrs. Smith at her home in Pleasant Hill, Tennessee, by St. Louis Refining Company.

During the course of the conversation or interrogation, Smith was shown the diamonds which the investigating officials had obtained from Quarles Jewelry Store in Chattanooga. He positively identified them as being the same diamonds which he had sent to St. Louis Refining Company and which had been forwarded by that company to his wife and which he later delivered to Quarles with instructions "to mount the large stone and seven of the medium size stones in a man's ring for which he said he had a sale * * *"

Smith described the large diamond as being a "mine cut stone, * * * an old cut diamond."

Gatlin testified that during the interrogation on February 27, 1964, Smith told him that he had seen Mrs. Boone on only three occasions. The first time he saw her was when she came into the store where he worked and asked him to come to her home to make an appraisal "on cleaning of her silverware." The next time he saw her was in the summer of 1963 when he went to her home to make the appraisal. He offered to do the work for $150. Mrs. Boone would not pay that price. The last time he saw her was after he had been to her home. She was passing the store where he worked and Smith remarked to someone, "There goes the old lady that has all of that old dirty silver."

Smith told Gatlin that the only time he had ever been in Mrs. Boone's house was when he went there to make the appraisal.

According to Gatlin, Smith told him that "to dismount those diamonds from the ring or watch that you would have to have a block and a vise and a blade, and that if you used a pick on them you would scatter them all over the place; that it would take an expert to remove those diamonds without injury to them." ,

According to Gatlin, Smith told him during the questioning that he, Smith, had seen an article about Mrs. Boone's death but had not read it; that he had asked a member of the Troy Police Department if they had located Mrs. Boone's diamonds; that on the Monday after Mrs. Boone's body was discovered, the "Troy Police Department" advised him at the "store" to be on the lookout "for anyone who might want to be pawning or selling any diamond rings" but he was not given a description of the rings.

Dr. Shoffeit, the toxicologist, testified on behalf of the State relative to a visit which he, Mr. Brantley and Sheriff Davis had with Smith in the county jail on March 11, 1964, the day on which Smith was indicted for the murder of Mrs. Boone.

Smith made certain statements on that occasion but before· he did so no one threatened him or made him any promise or gave him any hope of reward for making the statements. Before making the statements, Smith was advised by Mr. Brantley, in effect, that anything he said or gave "could be used for an examination or could be used against him and he would have to do it voluntarily and no one could force him to make any statement or give any evidence, that he would have to do it purely on his own and it could be used against him." No attorney representing Smith was present. He was not told he was entitled to have an attorney present and he did not ask that an attorney be present during the questioning to represent and advise him.

At least one purpose of the visit by Dr. Shoffeit, Mr. Brantley and Sheriff Davis to Smith on March 11, 1964, was to ascertain if Smith would be willing to give them a "specimen of hair." Although such a request was made of Smith the record is silent as to his reaction to the request. As far as the record shows no such specimen was obtained.

During the visit, interview or questioning, Smith, according to Dr. Shoffeit, said that he would like to "correct an error" that he had previously made with reference to the times he had been in Mrs. Boone's home. Smith said that one or two weeks before her death he received a call from Mrs. Boone and went to her house at about 8:30 P.M. He said that was the last time he was in her house. Mrs. Boone said she was hungry and expressed a desire to go to Montgomery. Smith and Mrs. Boone drove in Smith's car in the direction of Montgomery but stopped at an eating place "short" of Montgomery. After finishing their meal they left for Troy, arriving at Mrs. Boone's home around midnight. Smith said he did not go in the house at that time. Smith also told the officials present that they "would find his hairs on her couch and his hair and fingerprints in her house."

Smith, according to Dr. Shoffeit, stated that he would also like to change another story if his wife was brought to his cell, relative to how he came into possession of the diamonds. Sheriff Davis brought Mrs. Smith into the jail and she and Smith "talked a while between the bars."

After their conversation was concluded, Smith, according to Dr. Shoffeit, said that he did not get the diamonds in the manner previously outlined by him. He said that the unidentified man came into the store where he worked. Smith was alone in the store until the man entered it. The man offered to sell the diamonds to Smith for

$150. Smith made a counter offer of $100 which the man accepted. The man was told by Smith to go to a drug store. Smith then went to a bank where he asked for a loan of $100 "to buy Christmas shopping." He was finally able to secure the loan without his employer's signature on the note. He deposited the $100 as well as a part of his pay check. Smith then went to the drug store where he met the man with the diamonds. They left the drug store and walked down the street "where the exchange was made." Smith gave the man $100 and the man in turn delivered the diamonds to Smith. Smith has not seen the man since.

According to Dr. Shoffeit, Smith talked "much and freely" and mentioned his "whereabouts on the Thursday night prior to the Sunday on which Mrs. Boone's body was found." Dr. Shoffeit testified: "He told us that he [Smith] was awakened by the T.V. going off, that he walked down Brundidge Street within two blocks of Mrs. Boone's house and over to the Varsity [Grill] where he met a student. He probably had a sandwich and a cup of coffee, he wasn't sure. He got in a car with a student and came back to town when the student was stopped for some traffic violation."

During the course of the interview on March 11, 1964, Smith inquired of the State and County officers with whom he was talking as to what evidence they had against him and asked if an indictment had been returned against him. He was advised that the grand jury was in session and the action of the grand jury could not be divulged. Smith "reminded" the officials that they "would have to have evidence beyond a doubt that those diamonds that he had were Mrs. Boone's diamonds; and that we would have to have evidence beyond a doubt that he did enter the house and kill her before he could be convicted."

Sheriff Davis, a witness for the State, testified as to statements made to him and

Mr. Brantley by Smith on March 20, 1964, in the Pike County jail. Davis stated that a few days before March 20, 1964, Smith asked him to tell Solicitor Brantley that he wanted to see him. In accordance with that request, Sheriff Davis and Mr. Brantley went to the jail to talk with Smith. Smith made certain statements. Before those statements were made neither the witness nor Mr. Brantley threatened Smith, offered him any hope of reward, promise of immunity or offered him any inducement for him to make a statement.

According to Sheriff Davis, Smith asked Mr. Brantley to tell him the nature of the evidence against him, saying that he would like to know. Mr. Brantley told Smith that he could not reveal the evidence.

In response to a request made by Mr. Brantley, Smith stated that he could not remember when it was that he and Mrs. Boone "went to Montgomery." Smith said he could not recall whether it was on a weekend or another night but that it was just "a few days or nights before she was killed." Smith then said to Mr. Brantley: "I have told part of the truth and I haven't told all of it. I want to tell you that I did go back to Mrs. Boone's house another time after we made the trip to Montgomery." Smith said that he thought Mrs. Boone was killed on Thursday night and he was there on the preceding Tuesday night, around eight or nine o'clock. Mrs. Boone was playing solitaire and he showed her a way to play whereby it would be easier for her to win. Smith stated that "no shade" was down that night although he had advised her that she should pull her shades down. After Mrs. Boone finished playing solitaire she and Smith talked for a while before he left. He told her he would be back Friday or Saturday night but that he never got around to it. Smith said that "he was a very frequent visitor to Mrs. Boone's, that he was there two or three times a week."

In response to a question propounded by Mr. Brantley as to where he was on

"Thursday night," Smith said that "after closing time, he went down to the drug store and got him a bowl of soup and went back to the jewelry store where he was staying and watched T.V. and went off to sleep. After he woke up the T.V. program had went off and he got up and went to the Varsity Cafe." In response to a question as to how he went to the Varsity Cafe he said: "* * * sometimes he went down South Three Notch Street but that night he happened to go across the square and down to the Varsity Cafe, and he got to the Varsity Cafe and drank two or three cups of coffee and left the Varsity with some man that received a ticket, he rode back to town with some person that received·a ticket by the police that night."

Sam Kelly, who was the jailer at the Pike County jail, testified as to statements made by Smith to Mr. Brantley in the witness' presence. According to Kelly, Mr. Brantley came to the jail a few days after March 20, 1964, on which occasion he admitted Brantley into Smith's cell at the jail. After doing so he closed the door to the cell and locked it. The witness remained outside the cell at a point where he could be seen and was so positioned that he could see those in the cell and hear what they said.

On that occasion neither the witness nor Solicitor Brantley threatened Smith or offered him "promise or hope of reward or anything else to try to get him to make the statement."

According to the witness, Smith told Mr. Brantley that he had pulled down the shade "on the front door" the last time "he was in Mrs. Boone's house, which was on a Tuesday night." He said he pulled the shade down to keep anyone from "seeing in." Smith also said on that occasion that "he was to go back on Thursday or Friday night." Smith never answered the question propounded to him by Mr. Brantley as to why he did not go back.

A Troy jeweler called as a witness for the State testified to the effect that the diamonds could have been removed from their settings by one other than an expert. One would have to have a little knowledge about the operation but not skill and a vise would not be needed. The removal could be accomplished by use of "a jeweler's ingraver." However, on cross-examination the witness conceded that one would have to be very careful in removing the very small diamonds, "millings," which are frequently used in ladies' watch cases. This witness also stated that the solitaire diamond which had been obtained from the Chattanooga jeweler was a mine cut diamond.

Douglas Griffin, a letter carrier, who delivered mail to Mrs. Boone's home, testified that he placed mail in her mailbox on Friday, December 13, 1963, and that mail was still in her box when he delivered her mail on the next day. He stated that Mrs. Boone was not in the habit of leaving her mail in the box. This witness also testified that on Saturday (December 14, 1963), the shade on Mrs. Boone's front door was down. He did not remember whether it was down on Friday, December 13. He also stated that on Saturday, December 14, there were papers on Mrs. Boone's porch.

There was evidence offered by the State to the effect that Smith was in the Varsity Grill during the early minutes of Friday morning, December 13, 1963. His clothes were damp but not soaking wet. Smith attributed the dampness of his clothes to the fact that "he had been taking a walk and had been caught in the rain." Smith left the Varsity Grill in an automobile driven by a college student who was arrested for a traffic violation while he was driving Smith to his place of employment, where he slept.

As we have shown, Investigator Gatlin testified that in the interview which he had with Smith on February 27, 1964, Smith first told him that he heard about Mrs. Boone's death on Sunday morning, December 15, 1963, but later corrected that state-

ment and said that he first heard of her death at about 4:30 that afternoon from Herman Youngblood in the Varsity Grill.

Youngblood, a witness for the State, testified that he was not in the Varsity Grill at any time on Sunday, December 15, 1963, and did not tell Smith that Mrs. Boone had been found dead "and her rings taken." Youngblood testified that he did not know Mrs. Boone had been killed until the following morning.

According to the State's evidence, Smith did borrow the sum of $100 from a Troy bank on Saturday, December 14, 1963, but the proceeds of the loan were not delivered to him. His account in the bank was credited with the amount of the loan.

According to Investigator Gatlin, Smith told him on February 27, 1964, that while he was in the bank on December 14, 1963, he cashed "his check" or a portion of "his check." The check was not identified by Smith on that occasion but he stated it was in the amount of $192.75. The State offered evidence to the effect that Smith was the payee of a check in that amount, bearing date of December 14, 1963, drawn on the account of Smith's employer, "Vaughn Jewelry Company." However, the bank's records show that the check was not cashed at the bank on December 14, 1963. A bank official testified that the records of the bank show that the $192.75 check was charged to the account of A. T. Vaughn on December 18, 1963.

Only two witnesses were called to testify on behalf of the defendant, Smith.

Henry Frazier testified that he was an employee of McLeod's Drug Store, where Smith worked on Sundays, and that in the middle of February, 1964, Smith "made it known to me that he had some diamonds. He didn't say they were loose diamonds, he just said diamonds and that he was going to make a ring for some person or for some party and said that he had enough diamonds to make two rings and he wanted me to buy the second ring."

Mrs. Mary Detes, the operator of McLeod's Drug Store, was shown "a check dated December 14, A. T. Vaughn Jewelry, number 3005, payable to B. O. Smith, $192.75," which bore her endorsement on the back. This check was later introduced in evidence by the defendant.

Mrs. Detes stated that the check shown her was evidently cashed at her drug store but she does not know the date on which it was cashed; that usually she does not make deposits at the bank on Saturday, but on the following Monday, "if we have enough"; that since the check shows that it was not paid until December 18, 1963, "that is just possible it wasn't deposited until the 18th."

Smith, the appellant, insists that the trial court erred to a reversal in admitting in evidence the statements made by Smith which we have summarized above in that at the time they were made no lawyer representing Smith was present. Appellant relies for a reversal on the holdings in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; People v. Dorado, Cal., 40 Cal.Rptr. 264,. 394 P.2d 952, cert. denied, 381 U.S. 937, 85 S.Ct. 1765, 14 L.Ed.2d 702 (see People v. Dorado, 62 Cal.2d 338, 42 Cal.Rptr. 169, 398 P.2d 361, cert. denied, 381 U.S. 946, 85 S.Ct. 1793, 14 L.Ed.2d 710; Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; and Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246.

In none of the statements made by Smith which the trial court admitted in evidence did Smith admit that he killed Mrs. Boone, but they all contained statements of an incriminating nature such as to warrant consideration by us of the cases cited and relied upon by appellant.

We will first treat the statement made by appellant on February 27, 1964, as related by Inspector Gatlin. The admissibility of that statement is not affected by Massiah v. United States, supra, because the statement was made prior to indictment and Massiah dealt with incriminating state-

ments elicited from Massiah after he had been indicted and in the absence of his counsel. Nor does the holding of the Supreme Court of the United States in Miranda v. State of Arizona, supra, affect the admissibility of that statement. The trial of this case, as we have heretofore shown, began on July 9, 1964, and *Miranda* was decided on June 13, 1966, and the Supreme Court of the United States in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882, decided on June 20, 1966, held that "Miranda applies only to cases in which the trial began after the date of our decision one week ago." See Eaton v. State, 280 Ala. 659, 197 So.2d 761, and cases cited. In Duncan v. State, 278 Ala. 145, 176 So.2d 840, we declined to follow the holding of the California court in People v. Dorado, supra, and we do likewise in this case. We come now to a consideration of the effect of the holding of the Supreme Court of the United States in Escobedo v. State of Illinois, supra, which was decided by the Supreme Court of the United States on June 22, 1964, prior to the date on which the trial of this case began. See Johnson v. State of New Jersey, supra.

 The opening paragraph of the opinion in *Escobedo,* supra, reads:

"The critical question in this case is whether, under the circumstances, the re-- fusal by the police to honor petitioner's request to consult with his lawyer during the course of an interrogation constitutes a denial of 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment.' Gideon v. Wainwright, 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799, and thereby renders inadmissible in a state criminal trial any incriminating statement elicited by the police during the interrogation." 378 U.S. 479, 84 S.Ct. 1759. Later on in the opinion the Court said:

"We hold, therefore, that where, as here, the investigation is no longer a gen-

eral inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S., at 342, 83 S.Ct. at 795, and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." 378 U.S. 490–491, 84 S.Ct. 1765. The opinion concludes with this sentence: " * * * We hold that only when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." 378 U.S. 492, 84 S.Ct. 1766.

But unlike *Escobedo,* the record in this case does not show that at the time Smith made the statement about which Gatlin testified Smith was denied an opportunity to consult with a lawyer. He did not have a lawyer and did not request the presence of a lawyer to represent him at that time. In fact, the record shows that he did not want a lawyer at that time, although he made it known that he would want counsel appointed to represent him at a trial.

In Duncan v. State, supra, we followed those courts which had held that *Escobedo* is a controlling precedent only in cases when all the factors specified in *Escobedo* are present.

All of those factors are not present in this case, so we conclude that the holding in *Escobedo* did not affect the admissibility

of the statement made by Smith on February 27, 1964, about which Gatlin testified.

The same is true as to the other statements made by Smith which the trial court admitted in evidence. So we will dispense with any further reference to *Escobedo* as we come to consider the admissibility of those statements. Nor will we give further consideration to *Miranda* or *Dorado* in dealing with the other statements. The holdings in those cases are inapplicable to the other statements for the same reasons which make them inapplicable to the statement made by Smith on February 27, 1964, to Gatlin and Brantley.

 But we must give consideration to the holding of the Supreme Court of the United States in Massiah v. United States, supra. Massiah was decided on May 18, 1964, before the trial of this case began. Massiah was indicted for violating the federal narcotic laws. He retained a lawyer, pleaded not guilty, and was released on bail. While he was free on bail a federal agent succeeded by surreptitious means in listening to incriminating statements made by him. Evidence of those statements was introduced against Massiah at his trial over his objection. He was convicted. The Supreme Court of the United States in reversing said:

"We hold that the petitioner was denied the basic protections of that guarantee [Sixth Amendment] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him *after he had been indicted and in the absence of his counsel.*" (Emphasis supplied) 377 U.S. 206, 84 S.Ct. 1203.

In Duncan v. State, supra, we made the following observations about the holding in *Massiah:*

" * * * Since the Court expressly bypassed the question as to whether the confession was bad because of a violation of Massiah's rights under the Fourth Amendment, the words which we have italicized above seem to be the real basis of the reversal. We think it sufficient to distinguish Massiah by pointing out that the confessions in this case came before indictment. Massiah is, of course, a case which originated in the federal court, but it no doubt applies to state courts since the right to counsel guaranteed in the federal system by the Sixth Amendment has been held to be binding upon the states by virtue of the due process guarantee of the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799." 278 Ala. 166–167, 176 So.2d 860.

We cannot determine from the record before us as to whether the statements made by Smith to Dr. Shoffeit and others on March 11, 1964, were made before or after he was indicted by the grand jury on the same day.

Even if we assume that the questioning of Smith on March 11, 1964, took place after he was indicted, it was not done in the absence of counsel retained by Smith or in the absence of counsel appointed by the court to represent him. Smith had not retained counsel and the trial court had not appointed counsel at that time. As we have shown, Massiah was questioned after indictment in the absence of counsel of his own choosing and after he had entered a plea of not guilty. The opinion in Massiah concludes: "All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial."

In United States v. Guerra, 2 Cir., 334 F.2d 138, *Massiah* was construed as, at least, suggesting that any form of post-indictment interrogation when a defendant is not assisted by an attorney unlawfully abridges the right to counsel guaranteed by the Sixth Amendment. But, in our opinion, Massiah does not so hold.

In view of the fact that *Massiah* is factually distinguishable from the case at bar in the respects pointed out above, we hold that the statement made by Smith to Dr. Shoffeit and others on March 11, 1964, was not rendered inadmissible by the holding in *Massiah,* even if the statements were made after Smith was indicted.

Likewise, we hold that *Massiah* does not render inadmissible the statements made by Smith to Sheriff Davis and Mr. Brantley on March 20, 1964, or the statements made by Smith to Mr. Brantley a few days after March 20, 1964, within the hearing of Jailer Kelly.

We find no reversible error in the action of the trial court in admitting in evidence any of the four statements made by Smith.

 Appellant insists that the trial court erred in permitting State witness Robert A. McGehee to testify over the objection of the appellant that in his opinion the death of Mrs. Boone was caused by strangulation. McGehee was an undertaker with twenty-seven years experience in that field. He has served as Coroner of Pike County for the same length of time. The fact that McGehee was Coroner of the county did not qualify him to express an opinion as to the cause of death. Nor is an undertaker, as such, an expert on the question as to the cause of death of a deceased. Anderson v. State, 19 Ala.App. 606, 99 So. 778; Daniel v. State, 31 Ala. App. 376, 17 So.2d 542.

 But it is not necessary that a witness be shown to be a practicing physician before he can express an opinion as to the cause of death. The rule is stated in Hicks v. State, 247 Ala. 439, 441, 25 So.2d 139, 140, as follows: "The nature of a wound or injury, its probable cause and effect can be stated by expert medical witnesses, or witnesses shown to be familiar with such questions; such as, an undertaker, or others showing competency. * *"

 In view of the predicate laid for his testimony and his statement of ex-

perience in observing bodies to determine cause of death, we are of the opinion that the witness McGehee was shown to possess the requisite qualifications to give an opinion as to the cause of death. The question as to whether a witness is shown to possess the requisite qualifications is a preliminary question said to be largely within the discretion of the trial court. Hicks v. State, supra; Wilson v. State, 243 Ala. 1, 8 So.2d 422; DeSilvey v. State, 245 Ala. 163, 16 So.2d 183; Willingham v. State, 261 Ala. 454, 74 So.2d 241. We are unwilling to hold in this case that the trial court abused its discretion in permitting McGehee to express his opinion as to the cause of the death of Mrs. Boone. Phillips v. State, 248 Ala. 510, 28 So.2d 542; Odom v. State, 253 Ala. 571, 46 So.2d 1; McMurtrey v. State, 39 Ala.App. 319, 101 So. 2d 88, cert. denied, 267 Ala. 259, 101 So.2d 93; Jordan v. State, 40 Ala.App. 693, 122 So.2d 545.

 Appellant argues that the court erred in admitting in evidence the three photographs of the body of Mrs. Boone taken by Investigator Gatlin. These photographs show the position of the body when it was found and show that some article had been placed around the neck. The body was fully clothed. Under the facts of this case, we are not willing to say that the trial court erred to a reversal in permitting the introduction in evidence of the three photographs. Smarr v. State, 260 Ala. 30, 68 So.2d 6; Payne v. State, 261 Ala. 397, 74 So.2d 630; Maund v. State, 254 Ala. 452, 48 So.2d 553; Gipson v. State, 262 Ala. 229, 78 So.2d 293; McKee v. State, 253 Ala. 235, 44 So.2d 781.

 It is contended by appellant that the trial court erred to a reversal in admitting into evidence, over his objection, the diamonds which State and County officials obtained from the jewelry store in Chattanooga in that they were never sufficiently identified as having been owned by the deceased, Mrs. Boone.

Mrs. E. L. Turner, a sister of the deceased, was a witness for the State. After testifying that her sister owned two diamond rings, one a solitaire and the other a cluster containing several diamonds (she did not know the exact number of diamonds in the cluster), the following transpired on direct examination:

"Q. Mrs. Turner, will you look at these stones here consisting of one solitaire and seven smaller diamonds, and I am not asking you that these are your sister's diamonds; I am asking you whether or not this large stone appears to you to be identical in size, cut, and brilliance to the stone your sister wore all of her life since she was married?

Mr. Walters [one of Smith's lawyers]: We object to that.

The Court: Overruled.

Mr. Walters: We except.

A. You want me to answer.

Q. (Mr. Brantley continuing) [County Solicitor] Yes, ma'am.

A. That is as near like her stone as anyone I could ever know in color.

Q. Now the smaller ones. I will ask you whether or not they appear to be the same size as the stones in her cluster?

A. Yes, they do."

On cross-examination Mrs. Turner testified that she had looked at the diamonds "worlds and worlds of times"; that the solitaire shown her was about the same size as the one her sister wore "as near as I could possibly say," that it "is similar" to the one her sister had. She also stated on cross-examination that the smaller diamonds which had been exhibited to her "were similar to the ones in the cluster" which her sister had.

Mrs. Pearl Trotter, who washed and set Mrs. Boone's hair on an average of "every four to six weeks," a witness for the State, testified that she had seen the "diamond cluster" which Mrs. Boone wore and that it contained seven stones.

Appellant asserts that the admission in evidence of the diamonds constituted reversible error under the holdings in Buchanan v. State, 109 Ala. 7, 19 So. 410, and Cunningham v. State, 22 Ala.App. 583, 118 So. 242.

We do not think the holdings in those cases are controlling here.

The *Buchanan* case, a larceny case, does contain language which, when casually read, seems to support the position taken by appellant. It was cited in the case of Carter v. State, 35 Ala.App. 530, 50 So.2d 4, also a larceny case. In the *Carter* case, the appellant took the position that the trial court erred in admitting in evidence certain articles found in Carter's home on the ground that "they and each of them were not properly identified as articles taken from the burglarized building."

In regard to one item, a cloth bag, Judge Carr, writing for the Court of Appeals, held that the positive identification of the bag by a State's witness removed all doubt of the propriety of its admissibility. But as to the other articles—Chesterfield, Phillip Morris and Camel cigarettes and Juicy Fruit chewing gum—found in the appellant's home, the only evidence offered by the State was that they were similar in kind, quantity and character to articles taken from the burglarized building.

The Court of Appeals held that the articles described in the above paragraph were properly admitted in evidence under the holdings in Tyra v. State, 17 Ala.App. 92, 82 So. 631, and Allen v. State, 8 Ala.App. 228, 62 So. 971.

In the *Carter* opinion appears the following reference the *Buchanan* case:

"Appellant's counsel cites and presses the holding in Buchanan v. State, 109 Ala. 7, 19 So. 410, as an authority for his position.

"A close study of this opinion will clearly disclose that the court there was dealing with an entirely different approach to the question from that with which we are now confronted. Headnotes 1 and 2 fully delineate the facts upon the basis of which the lower court admitted the articles in evidence and for which action error was charged." (35 Ala.App. 531–532, 50 So.2d 5)

We agree with the construction placed on the *Buchanan* case in the *Carter* case.

The *Cunningham* case, supra, was apparently cited and relied upon by appellant because it contains the following language:

"It was relevant to prove that on the night of the assault and just prior thereto the defendant had a hammer and for purposes of description it was permissible to exhibit a hammer to the witness then testifying and ask her if the hammers were similar. As to whether the hammer exhibited was ever so identified as to be admissible in evidence as the hammer used in the assault presents a very different question. If it was so identified and found in the shop of defendant, it would have been admissible as a circumstance against the defendant, and, if not so identified, it would not be so admissible. The court, by its rulings, observed this distinction and in so doing did not err. * * * " (22 Ala.App. 587, 118 So. 245)

We do not construe the language just quoted as constituting a holding that the hammer could not have been legally admitted in evidence unless it was positively identified as being the hammer used in the assault.

In Blackmon v. State, 246 Ala. 675, 22 So.2d 29, this court said, in part, as follows:

"The testimony of Carter was material as it tended to connect the defendant with Chris Blackmon's possession of deceased's property. The fact that at this point in the evidence there was no positive identification of either the pistol or the cap which Coleman had and wore the night he was killed merely goes to the weight of the evidence and not its admissibility. In this jurisdiction the possession by the accused of property belonging to the deceased or property of similar character and kind is admissible in prosecutions for homicide. * * * " (246 Ala. 680, 22 So.2d 32)

Diamonds, with perhaps a few exceptions, are difficult to identify with absolute certainty and may be compared to money in difficulty of positive identification. In Volume One, Wigmore on Evidence, Third Edition, § 154, p. 601, it is said:

"The mere possession of a quantity of money is in itself no indication that the possessor was the taker of money charged as taken, because in general all money of the same denomination and material is alike, and the hypothesis that the money found is the same as the money taken is too forced and extraordinary to be received. But where the denominations of the money found and the money taken correspond in a fairly close way, the fact of the finding of that specific money would have probative value and be relevant, because the money found is fairly marked or identical with the money taken."

See State v. Gyngard (Mo.), 333 S.W.2d 73, 90 A.L.R.2d 639; Commonwealth v. Locke, 335 Mass. 106, 138 N.E.2d 359.

Most courts which have been confronted with the problem of the admissibility in evidence of articles which, because of their similarity to the articles involved in the crime tend to connect the defendant with the commission of the crime for which he is on trial, hold that the lack of positive identification affects the weight of the evidence rather than its admissibility. See State v. Hill, 193 Kan. 512, 394 P.2d 106; Gouard v. Oklahoma (Cr.Ct. of App. of Okl.), 335 P.2d 920; State v. Westphal, 62 Wash.2d 301, 382 P.2d 269, cert. denied,

Westphal v. Rhay, 375 U.S. 947, 84 S.Ct. 358, 11 L.Ed.2d 277; Alejandro v. Texas (Tex.Cr.App.), 394 S.W.2d 523; State v. Graham, 237 S.C. 278, 117 S.E.2d 147; Moreno v. Colorado, 156 Colo. 503, 400 P. 2d 899; Commonwealth v. Parrotta, 316 Mass. 307, 55 N.E.2d 456.

In People v. Cullen, 37 Cal.2d 614, 234 P.2d 1, a murder case, the Supreme Court of California said:

"Prejudice is asserted from the ruling which permitted in evidence the rings handed to the sheriff by Boyhtari in accordance with testimony that they were similar to rings concededly owned and worn by Mary Cullen [one of the murder victims]. It is contended that the evidence fails to establish that they were the identical rings which belonged to her. Similar complaint is made as to other exhibits. Certain and positive identification was not required. The evidence of similarity was sufficient to justify the admission in evidence of the rings and the other objects, the question of weight and credibility being for the jury. People v. Ferdinand, 194 Cal. 555, 563–565, 229 P. 341."

The testimony of Mrs. Turner to the effect that the solitaire and the seven smaller diamonds admitted in evidence were similar in size and color to those which had belonged to her deceased sister, Mrs. Boone, coupled with the other facts and circumstances set out above, was sufficient to warrant a submission of the question to the jury as to whether or not they were, in fact, diamonds which had belonged to the deceased.

The State apparently made no effort to establish the similarity of the "millings," the very, very small diamond chips which were admitted in evidence, to the "millings" which had been in a watch case or band which had been owned by Mrs. Boone but which could not be located after her death. Nevertheless, we do not feel that the admission in evidence of the "millings" should work a reversal. In one of

his statements Smith admitted they were the same "millings" which he said he purchased from the unidentified man on the day before Mrs. Boone's body was discovered and were the same "millings" which he had left with the Chattanooga jeweler at the time he left with him the solitaire and the seven smaller diamonds. All of the diamonds were in the same box delivered to the Alabama authorities by the Chattanooga jeweler.

Counsel for appellant insist upon other rulings of the trial court upon the admission and exclusion of evidence as constituting reversible error. We will not undertake to deal with those rulings in this opinion, for they are not likely to occur on another trial, and for the reason hereafter shown we are constrained to the conclusion that the judgment here under review must be reversed.

During the course of County Solicitor Brantley's argument to the jury the following transpired:

"Mr. Brantley: Now, if we had come here with only the first story he had told, if that was the only story he ever told, and it might well have been for he told it for all the truth; if we had laid before you the only story we had and that was the story that he gave us and stuck to that he had been in the house only one time and had only seen this lady three times in his life, if that had been the evidence; but, then if Dr. Paul Shoffeit had come in here and said, 'Gentlemen, that story is a lie because we found a fresh print of a thumb on this window shade down there,' and it is B. O. Smith's print, what would you think? What would you think? And yet I tell you that this fresh print was on that window shade. I tell you that it is true, his print was on that window shade and he knew it was on there.

Mr. Walters: We object to that. There is no evidence that his print was on there.

Mr. Brantley: Yes there is.

Mr. Walters: No there is not.

Mr. Brantley: It is Mr. Smith's evidence that he pulled it down with his hand.

The Court: Overruled, gentlemen, this is not argument.

He is not arguing that there is any testimony that it was.

Mr. Walters: Yes he is, Judge.

Mr. Brantley: I didn't say he took it off, I said it was on there.

The Court: Overruled, go ahead.

Mr. Walters: We except."

There is absolutely no evidence in this record going to show that the fingerprints of Smith were found anywhere in the home of Mrs. Boone.

The only testimony in regard to fingerprints of Smith was that given by Dr. Shoffeit, who said that in the statement which Smith made in the presence of the witness, County Solicitor Brantley and Sheriff Davis in the Pike County jail on March 11, 1964, Smith said:

"* * * that he would like to correct an error that he had made with reference to the time that he was in Mrs. Boone's house; said we would find his hair and fingerprints in her house. We would find his hairs on her couch; that he had been in this house shortly before she was found dead. He didn't know whether it was one week or two weeks but, shortly before that time he was in her house."

Certainly that statement by Smith would not justify the statement by Mr. Brantley: "And yet I tell you that his *fresh* print was on that *window shade*. I tell you that it is true, his print was on that window shade and he knew it was on there." (Italics ours) Smith, according to Dr. Shoffeit, simply said, in effect, that the officers investigating Mrs. Boone's death would

find his fingerprints in Mrs. Boone's house. He did not say his fingerprints were fresh or that they were on the window shade.

State's witness Kelly testified that he heard Smith tell Mr. Brantley that on "a Tuesday night," the last time he was in Mrs. Boone's house, he pulled down the shade on the front door.

Apparently Mr. Brantley and the trial court felt that since Smith, according to Kelly, admitted pulling down a shade on the front door on "a Tuesday night," Mr. Brantley was justified in telling the jury that Smith's fresh fingerprint was on "that window shade." Actually Smith had not even said anything about pulling down a window shade. He said he pulled down the shade on the door. But, in our opinion, the mere fact that Smith said that on "a Tuesday night" he pulled down a shade in Mrs. Boone's house would not justify the argument made by Mr. Brantley to the jury that Smith's fresh fingerprints were on any shade. The fact that an individual touches an object does not justify a conclusion that his fingerprints were left on that object. And that is the effect of Mr. Brantley's argument. Even after the trial court, in overruling objections to the first statements made by Mr. Brantley, stated: "* * * this is not argument. He is not arguing that there is any testimony that it was," Mr. Brantley said: "I didn't say he took it off. I said it was on there." There was no evidence that "it" (fingerprint) was on there and no evidence which supports a reasonable inference to that effect, in our opinion.

In our recent case of Rogers v. State, 275 Ala. 588, 157 So.2d 13, we reversed because of a statement made by counsel for the State in his argument to the jury, which statement found no support in the evidence. We made reference to the rule so often stated by the appellate courts of this state that "counsel should not be permitted to state as fact that which is dam-

aging. to defendant, and of which there is no legal proof." Coleman v. State, 87 Ala. 14, 6 So. 290; Eaton v. State, 278 Ala. 224, 177 So.2d 444; Moore v. State, 39 Ala.App. 235, 97 So.2d 166; Nix v. State, 32 Ala.App. 136, 22 So.2d 449.

■ There is no legal standard by which the prejudicial qualities of improper remarks of a solicitor in the trial of a case can be gauged. Each case must be determined on its own merits. Anderson v. State, 209 Ala. 36, 95 So. 171; Hawkins v. State, 29 Ala.App. 221, 195 So. 762, cert. denied, 239 Ala. 532, 195 So. 765.

■ We cannot say that Mr. Brantley's remarks here under consideration were not damaging to the appellant. True, his statement merely put the defendant in Mrs. Boone's home on "a Tuesday night" and a witness for the State had testified that Smith had admitted being in her home on several occasions. And other witnesses, as we have shown, testified to the effect that Smith admitted being there on the Tuesday night prior to her death, which occurred apparently on Thursday night, December 12, 1963. But it was for the jury to determine under all the facts and circumstances whether they wanted to believe those witnesses.

The State's case against appellant rested entirely on circumstantial evidence. In essence, the State's case was grounded on the possession by appellant of diamonds similar to those owned by Mrs. Boone prior to her death, which were missing at the time her body was found, and the conflicting statements made by appellant, according to the State's witnesses.

We do not believe the State should have been permitted to strengthen its case by permitting the County Solicitor to state as a fact that which found no support in the evidence.

In view of the possibility of another trial, we call attention to a statement in Sims v. State of Georgia, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593, where the case

of Jackson v. Denno was discussed and where it was said: . .

"* * * A constitutional rule was laid down in that case [Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908] that a jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. The rule allows the jury, if it so chooses, to give absolutely no weight to the confession in determining the guilt or innocence of the defendant but it is not for the jury to make the primary determination of voluntariness. Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity. * * *" 385 U.S. 543–544, 87 S.Ct. 643.

See Harris v. State, 280 Ala. 468, 195 So.2d 521; Duncan v. State, 278 Ala. 145, 163, 176 So.2d 840; Annotation in 1 A.L. R.3d, pp. 1251–1259.

Although the statements by appellant, introduced by the State, did not contain an admission by appellant that he killed Mrs. Boone, the federal courts might well say that the rule of Jackson v. Denno, supra, should be followed.

For the reason stated, the judgment of the trial court is reversed and the cause is remanded.

Reversed and remanded.

LIVINGSTON, C. J., and GOODWYN and COLEMAN, JJ., concur.

## ON REHEARING

LAWSON, Justice.

We adhere to our holding in the original opinion that the trial court committed reversible error in overruling the defendant's objections to the statement made by the County Solicitor in his argument to the jury: "And yet I tell you that his fresh

print was on that window shade. I tell you that it is true, his print was on that window shade and he knew it was on there."

In brief filed in support of the State's application for rehearing appears the following: "In the event that this Honorable Court should overrule and deny our motion for rehearing, the appellee respectfully requests this Honorable Court to extend the opinion of March 14, 1968, to direct the trial court in the applicability of the Miranda rule to second trial."

As pointed out in our opinion on original deliverance, the Supreme Court of the United States in Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L. Ed.2d 882, decided on June 20, 1966, held that the rule governing the admissibility of a confession announced in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, had to be applied "only to cases in which the trial began after the date of our decision one week ago." (June 13, 1966)

In so far as we are advised, the Supreme Court of the United States has not resolved the question as to whether the Miranda warning requirements, a prerequisite for the admissibility of a confession, are to be applied to retrials occurring after June 13, 1966, of cases which were originally tried prior to the Miranda decision and, of course, that question can be resolved finally only by the Supreme Court of the United States.

However, other courts, federal and state, have written to or taken cognizance of the question. They are not in agreement.

In Gibson v. United States, 363 F.2d 146 (Fifth Circuit, 1966), the court reversed a pre-Miranda conviction involving a Dyer Act violation. The defendant had made statements and admissions to an FBI agent and on remandment the court indicated that the statements "must now hurdle the barriers" set forth in Miranda.

The United States Court of Appeals for the Third Circuit in Government of the Virgin Islands v. Lovell, 378 F.2d 799 (1967), in a footnote reference indicates that if the case had to be retried, then Miranda must be applied and cited the *Gibson* case, supra.

See also United States v. Pinto, 259 F. Supp. 729 (D.N.J.1966), aff'd Per Curiam, 374 F.2d 472 (Third Circuit, 1967).

In Amsler v. United States, 381 F.2d 37 (Ninth Circuit, 1967), this federal court observed "without deciding" that Miranda should be applied in the retrial of a pre-Miranda conviction.

In State v. Brock, 101 Ariz. 168, 416 P. 2d 601, the Supreme Court of Arizona held that the subsequent retrial of a pre-Miranda first degree murder conviction which it reversed should be subject to the principles enunciated in Miranda. To like effect are the following state court decisions: People v. Doherty, Cal., 59 Cal.Rptr. 857, 429 P.2d 177; State v. Ruiz, 49 Haw. 504, 421 P.2d 305; State v. McCarther, 197 Kan. 279, 416 P.2d 290; Creech v. Commonwealth (Ky., 1967), 412 S.W.2d 245; State v. Jackson, 270 N.C. 773, 155 S.E.2d 236; State v. Shoffner, 31 Wis.2d 412, 143 N. W.2d 458; People v. Sayers, 28 A.D.2d 227, 284 N.Y.S.2d 481.

On the other hand, a few state courts have held, in effect, that the requirements of the Miranda case do not govern retrials occurring after June 13, 1966, of cases that were originally tried prior to that date, the effective date of Miranda. Jenkins v. State (Del.), 230 A.2d 262; People v. Worley, 37 Ill.2d 439, 227 N.E.2d 746; State v. Vigliano, 50 N.J. 51, 232 A.2d 129; Commonwealth v. Baity, 428 Pa. 306, 237 A.2d 172.

■ Even if we were inclined to agree with the holdings of the cases last cited, our conclusion would not be binding on the federal courts. We must face reality. Since the United States Circuit Court of Appeals for the Fifth Circuit in the *Gibson* case, supra, held, in effect, that the Miranda rule applies to retrials occurring after June 13, 1966, of cases which were origi-

nally tried prior to the Miranda decision, we entertain the view that the safer course for the trial courts of this state to follow until the Supreme Court of the United States has finally determined the question is to comply with the *Gibson* case, supra.

If Smith is retried and convicted without the rule of the Gibson case being applied, and if we affirm the judgment of the court below on appeal to this court by Smith, our action would be altogether unavailing. Smith, under Faye v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, and Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, could institute habeas corpus proceedings in a United States District Court and that court would, no doubt, feel compelled to follow the holding of the United States Court of Appeals for the Fifth Circuit in the *Gibson* case, supra.

The opinion is extended and the application for rehearing is overruled.

LIVINGSTON, C. J., and COLEMAN and KOHN, JJ., concur.