**In re JLJ, INC., d/b/a All American Trade Day, Debtor.**

**JLJ, INC., d/b/a All American Trade Day, Plaintiff,**

v.

**RUSH BUILDING COMPANY, INC. and Karen B. Rush, Defendants.**

Bankruptcy No. 88–08752.
Adv. No. 89–0675.

United States Bankruptcy Court, N.D. Alabama.

April 27, 1990.
Conclusions by the Court May 25, 1990.

---

**27.** The Verwers have previously reserved the right to present evidence of any factual issue not determined.

Harry P. Long, Anniston, N.J., for JLJ, Inc.

Daniel B. King, Gadsden, Ala., Edward L. Hardin, Jr., and John A. Taber, Birmingham, Ala., for Karen B. Rush.

Robert W. Hanson, Albertville, Ala., and Tameria S. Driskill, Guntersville, Ala., for Rush Bldg. Co., Inc.

## FINDINGS OF FACT

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

At Anniston, Alabama, on April 19 and 20, 1990, there was tried before the Court

that aspect of the above-styled adversary proceeding whereby the Court is requested to determine to whom the plaintiff should make the payments on its promissory notes to Karen Rush for $1,050,000, secured by a purchase-money mortgage on its real property, as between Karen Rush and Rush Building Company, Inc.

Upon a due consideration of said issue and of the stipulations of the defendants, of the evidence presented, and of the facts admitted, the Court finds the facts as here stated.

1. Charles Edward Rush (hereafter Edward Rush) and Karen Rush were married to each other in 1974. [R.B.C. Stip.]

2. In 1981 Karen Rush executed and delivered to Edward Rush a broad power of attorney, of unlimited duration and including authority to sign her name by use of a "facsimle." [sic] [R.B.C. Ex. 11]

3. Included in the power of attorney was the following provision: "[i]f at any time there should become a conflict between our two interests concerning financial or legal matters then his interest will come first and mine second."

4. She also provided him with a rubber stamp by which a facsimile of her signature could be affixed in ink to a paper or document. [R.B.C. Ex. 4]

5. On December 30, 1986, Karen Rush was the owner of record of a fee-simple title to a large tract of partially improved real property which lies along the easterly side of U.S. Highway 431, about one mile south of its descent from Sand Mountain into Guntersville, Alabama. [K.R. Ex. 57]

6. At that time she sold and conveyed her title to the property to the debtor, for the sum of $1,100,000.00, and the debtor executed and delivered promissory notes and a mortgage of the property to evidence and secure the unpaid balance of $1,050,-000.00 of the purchase price. [R.B.C. Exs. 17 and 18]

7. The sale of the property to the debtor was arranged by Edward Rush and was the culmination of negotiations begun by him some four months earlier.

8. On March 18, 1987, Karen Rush separated from Edward Rush under his threats of violence to her, and they have been estranged from then to now.

9. About two weeks after her separation, Karen Rush consulted with Chris and Nell Rush as to the possibility for her living with them so that she could resume her employment at Huntsville, Alabama, but this arrangement was not made because of their unwillingness to agree to her insistance that Edward Rush be barred from their home.

10. On or about March 24, 1987, Edward Rush had an attorney prepare an assignment of the debtor's note [sic] and mortgage and the indebtedness secured, from Karen Rush to Rush Building Co., Inc., (hereafter the corporation) [K.R. Ex. 56]

11. Edward Rush affixed a facsimile of Karen Rush's signature on the assignment and dated it December 31st, 1986, but no reference was made in it to its having been executed by an agent. [R.B.C. Ex. 20]

12. In a generally similar fashion, Edward Rush at that time undertook to execute for Karen Rush four or more deeds to effect a transfer of all real estate of record in the name of Karen Rush to Shamrock Farm & Land Corporation, partially owned by Nell Rush, except for one tract.

13. Nell N. Rush, mother of Edward Rush and wife of Chris Rush, record owner of most of the capital stock of the corporation and corporate secretary, and a notary public, purported to take the acknowledgement of Karen Rush's execution of the assignment. [R.B.C. Ex. 20]

14. On or about April 1, 1987, Kristine Rush, the daughter of Karen and Edward Rush, visited with her mother in Birmingham, Alabama, and at the request of her father asked her mother to sign an assignment to the corporation of the mortgage in question, but Karen Rush refused, and Kristine Rush relayed this information to her father, at an unspecified time.

15. On May 28, 1987, a general power of attorney from Karen B. Rush to Ralph Smith, Jr. was recorded in the office of the

Judge of Probate of Marshall County, Alabama, and was accompanied by an instrument revoking all powers of attorney granted prior to April 10, 1987. [K.R. Ex. 10]

16. In July, 1988, while a jail prisoner at Orlando, Florida, on criminal charges brought at the complaint of Karen Rush, Edward Rush affixed her facsimile signature to another purported assignment to the corporation of the debtor's note [sic] and mortgage, the indebtedness secured and the mortgaged property, which "assignment" was dated July 6, 1988, and filed for record in the office of the Probate Judge of Marshall County, Alabama; however, this instrument recited that it was done in her name, by him as her attorney-in-fact. [K.R. Ex. 13].

17. The debtor has paid to the corporation about $57,000 in payments on the mortgage note, but the down payment of $50,000 was by a check which Karen Rush deposited in her bank account.

18. Karen Rush does not have possession of the mortgage note and has never demanded that it be given to her.

19. The debtor's property was originally purchased in 1974, in the names of Edward and Karen Rush, who, on September 14, 1976, conveyed all but one acre to Chris and Nell Rush (his parents), and they shortly thereafter conveyed it to the corporation, which on February 26, 1986, conveyed it to Karen Rush. The other acre of the property was deeded by Edward and Karen Rush to his brother, Wendell, and the latter's wife, and later was deeded by Wendell and his wife to Karen Rush. [K.R. Exs. 1, 2, 3, 4, and 5]

20. The purchase price of the property was $175,000. A note, secured by a mortgage on the property, was given for an unpaid balance of $150,000, which was payable in 20 annual installments of $7,500, plus interest which accrues at 8½% of the unpaid portion per annum.

21. Edward Rush paid the 1975 installment on the mortgage note, Chris Rush paid the 1976 installment, Nell Rush paid the 1977 and 1988 installments, the corporation paid the 1978, 1979, 1980, 1981, 1982, 1983, 1984, 1985, and 1987 installments, and the 1986 installment was paid by a check drawn on Karen Rush's bank account. [R.B.C Ex. 13]

22. During the ownership of the property by Edward and Karen Rush, a building having 13,800 square feet of space was constructed on it by him, with his investment in the property being about $200,000; and later the corporation made improvements to the property at an estimated cost of $75,000 to $100,000.

23. In 1974, Chris Rush was contracting to do commercial building work as "Rush Building Co." and formed the corporation which is a party defendant herein, but his business and that of the corporation were not maintained as strictly distinct.

24. During the same period Edward Rush was engaged in the same type of business under the trade name of "Rush Contracting and Development Co."

25. At about this time Chris Rush obtained a general contract to build a hospital at Jacksonville, Alabama, and assigned the contract to Edward Rush.

26. Due to severe financial reverses suffered by Edward Rush while engaging in the business of coal strip-mining, he was unable to complete the hospital project without substantial financial advances or other assistance from Chris Rush and the corporation, and found himself substantially in debt to them and others, as well as locked in a dispute with the project bonding company, and it was to satisfy his obligations to Chris Rush and the corporation that the subject property was conveyed to Chris and Nell Rush, to the exclusion of his other creditors.

27. Originally, Nell Rush owned 30% of the capital stock of the corporation, and in 1980 Chris Rush conveyed to her all of his stock in the corporation, being 64%.

28. Throughout the corporation's existence, Edward Rush and his brother have, each, owned three percent of its capital stock, except, possibly, part of the time when Karen Rush may have held the three percent of Edward Rush. Chris Rush was

president of the corporation for a number of years, and Edward Rush, for most, if not all, of the corporation's existence, served as an officer or agent of the corporation, being its president at the time of trial.

29.　After Edward Rush's financial difficulties arose, he kept his creditors at bay by not maintaining any banking account or acquiring any property in his own name and instead used Karen Rush's bank account and used her to receive for him title to property and to receive payments, regularly utilizing her facsimile signature stamp to draw checks on her bank account.

30.　In order to enable Edward Rush to obtain needed loans, Nell Rush agreed for Karen Rush to show on financial statements submitted by her to prospective lenders the 64% of the corporate stock transferred to Nell Rush by Chris Rush. During this period, the corporate tax returns and other corporate papers showed that Karen Rush was the owner of 64% of the corporate stock.

31.　Karen Rush states that the conveyance of the subject property to her by the corporation was in exchange for "her" 64% of the corporate stock; however, Chris Rush, who signed the deed as corporate president, says that she owned no such stock and that he agreed to the conveyance in order to dampen Karen Rush's threat to reveal to Nell Rush a substantial extramarital affair carried on by Chris Rush; but the true motivation for the conveyance to her more likely was to further some deception deemed advantageous to the business interests of Edward or Chris Rush or the corporation or all of them.

32.　During the ten years prior to her estrangement from Edward Rush, Karen Rush was employed by and performed work, from time to time, for Chris Rush, the corporation, or an unrelated party at Huntsville.

33.　During this period of time or afterwards, the business activities of Edward and Chris Rush and the corporation involved false or mock notarial certificates on conveyances of land and other documents by Nell Rush and the execution by Edward and Chris Rush of sworn statements, certificates, or other documents, without regard to their truthfulness always tailoring the same to what appeared at the moment to be to the best interests of one or more members of this communal unit or of the community itself, with Karen Rush participating in the related transactions or schemes, as called upon by Edward Rush, until her estrangement from him—she having characterized her role as being that of a "pawn."

The evidence does not establish whether, according to the testimony of Karen Rush and her minor son, on the night that Karen Rush left Edward Rush, that she told Nell Rush to get the facsimile signature stamp from her husband and to destroy it, or whether, according to the testimony of Nell Rush and others, Karen stated to Nell Rush that Edward had her power of attorney and signature stamp, that Nell was a notary public, and that they could do whatever they wanted to do with the property, as all she wanted was to leave.

Entered at Anniston, Alabama, on this 27th day of April, 1990.

## CONCLUSIONS BY THE COURT ON PAYEE FOR PROMISSORY NOTES SECURED BY DEBTOR'S REAL ESTATE

This case is pending before the Court under chapter 11, title 11, United States Code.　One aspect of the above-styled adversary proceeding in said case is the plaintiff's (debtor's) request that the Court determine whether it is indebted to Rush Building Company, Inc. (R.B.C.) upon its proof of claim for $1,267,539.58, or to Karen B. Rush (K. Rush) upon her proof of claim for a like amount.

On April 27, 1990, following an evidentiary trial, the Court entered detailed findings of fact upon this question, and only limited reference to the factual issues will be made here.

These claims are competing and mutually-exclusive claims and actually are one claim to a debt for the unpaid balance of the purchase price of the debtor's large

tract of commercial real property adjoining U.S. Highway 431 near the south boundary of the City of Guntersville, Alabama. The debt is evidenced by the debtor's promissory notes made payable to K. Rush and secured by the debtor's mortgage to her on said real property, recorded in Mortgage Record Book 819, beginning on page 124, in the office of the Probate Judge of Marshall County, Alabama.

On September 21, 1989, this Court entered an order in this case, which determined the value of this property to be $950,000 and allowed this claim as secured to that extent and as unsecured for the excess of that amount. The order recognized that there were two proofs of the one claim and "left to the further findings and determination by this Court" the question of whether the claim was owned by R.B.C. or K. Rush. At the trial of this adversary proceeding, R.B.C. and K. Rush reiterated that neither was questioning the right, title, or interest of the debtor in or to the real property, despite some questions which otherwise might be raised as to the formalities of the conveyance of this real property from K. Rush to the debtor.

In view of the two purported assignments of the mortgage debt by K. Rush to R.B.C., the latter is the record owner of the bankruptcy claim. K. Rush, however, repudiates these assignments and attacks their effectiveness on a number of grounds.

She asserts that the March, 1987, assignment is invalid for want of any disclosure or indication on its face that it was not executed by K. Rush personally but by or through her agent, Charles Edward Rush, with her signature facsimile having been stamped upon it by him. At that time he was her estranged husband and owned three percent of the capital stock of R.B.C., with three percent owned by his brother and the remaining 94% owned by his mother (even, if in name only).

Charles Edward Rush held a 1981 broad power of attorney from K. Rush, which included authority to sign her name by imprinting a facsimile of her signature with a rubber stamp. It contained a provision that "[i]f at any time there should become a conflict between our two interests concerning financial or legal matters then his interest will come first and mine second."

In support of K. Rush's motion for summary judgment, which was denied, her counsel cited the opinion in *Gillespy v. Hollingsworth*, 169 Ala. 602, 53 So. 987 (1910) (*reh'g denied*); offering it in support of their theory that the purported March, 1988, assignment from K. Rush to R.B.C. was ineffective because signed only with the facsimile "Karen B. Rush," rather than including "by Charles Edward Rush as her attorney in fact." The Alabama Supreme Court, however, upheld a deed there which was signed only in the name of the grantor's agent, followed by words descriptive of the agency. The decision may add some very slight weight to her position if any heed is given to the thought that the case indicates that at least some reference to the agency was made there and that without it (as is the case here) the deed would have been held defective.

Any real support for K. Rush's contention comes from Mr. Justice Simpson's statement that such a "deed" would have been found defective at common law but that a court of equity will cure the defect and "not permit the parties to be disappointed and their just rights defeated merely ... from inadvertence or ... ignorance." 53 So. 987, 988. This more subtle but much more helpful proposition is that without the help of the equity court the grantee would have lost the property to the principal's heir.

The execution of the instrument in *Gillespy* was distinctly different from the case here. There, the agent signed the agent's name, followed by words which described him as the property owner's agent, but, here, the assignment is signed with the payee's name, impressed upon the instrument by the facsimile stamp, without the agent's name or any reference to the agency.

The point is that, if K. Rush can get this Court to adopt the proposition that the type of execution of the document here, also, is defective and legally insufficient, R.B.C.

must rely upon equitable principals to establish its ownership of the debt and, if barred by unclean hands from receiving grace for its legally-insufficient assignment, R.B.C. will be decreed to have no recognizable claim to the debt. See *Carter v. Carter*, 282 Ala. 239, 210 So.2d 800 (1968); *Owens v. Owens*, 281 Ala. 239, 201 So.2d 396 (1967) (*reh'g. denied*).

It is apparent that some distinction between the execution of conveyances of an interest in real property and the execution of other types of instruments has been asserted when consideration has been given to the form which the execution took when the execution was by an agent for a principal.

In the article on "agency" in *American Jurisprudence 2d.*, there are two sections headed "Signing principal's name only,"[1] with the first (§ 191) dealing with contracts and the second (§ 195) dealing with deeds. As to contracts, it is stated that the "well-settled general rule is that the mere fact that the agent's name does not appear ... alone does not render the execution insufficient." The text, in § 195, is to somewhat the same effect as regards the execution of deeds, if on the face of the deed the principal and the agent are identified. If, however, as here, only the principal's name is signed to the deed, the text states that there is authority to the contrary, citing *Wood v. Goodrich*, 6 Cush 117 (Mass.1850). See *Gillespy v. Hollingsworth*, 169 Ala. 602, 53 So. 987 (1910) (reh'g denied). In a later case, however, the Massachusetts court did not apply the *Wood* doctrine to a contract for the sale of personal property. *Hunter v. Giddings*, 97 Mass. 41 (1867). That court, in referring to *Wood*, said that, without considering the precise accuracy of all the observations found in that opinion, upon a point which was not necessary to its decision, the Court did not think it applicable to the contract of sale.[2]

In *Kiekhoefer v. United States National Bank*, 2 Cal.2d 98, 39 P.2d 807 (1934) (*in banc*), the court rejected a check payee's contention that her endorsement on the check was a "forgery" simply because her authorized agent only signed her name. Besides refusing to apply the *Wood* doctrine to the endorsement of the check, the court stated that the *Wood* ruling had been criticized by the Supreme Court of Maine in *Forsyth v. Day*, 41 Me. 382, 391 (1856) and had been rejected by Prof. Williston in his work on *Contracts*, volume 1, page 564. The California court further wrote that the prevailing rule as to negotiable instruments had been correctly cited in *Flat Top National Bank v. Parsons*, 90 W.Va. 51, 110 S.E. 491 (1922), which found that under negotiable instrument statutes there was no necessity that the name of an agent must appear upon a note signed for his or her principal.

Despite the skepticism shown for the soundness of the views expressed in the *Wood* case, the Alabama Supreme Court, in *Gillespy*, indicated that a strict formality was applied at common law to a deed executed for a land owner by an agent and that defective deeds were saved only by the intervention of courts of equity. It is, therefore, appropriate to turn to the question of what kind of document is involved in the present case.

 The March, 1987, instrument purports to assign to R.B.C. the mortgage from the debtor to K. Rush and "the note and indebtedness that it secures, together with all of the lands in said mortgage described." Under the mortgage, K. Rush held a defeasible legal title to the real property which interest could be defeated by satisfaction of the promissory notes given by the debtor. Obviously, the part of the assignment which purports to convey this interest in real property, to be effective, would have to meet the requirements for a deed—such as the requirement for a witness, as provided by Ala.Code § 35–4–20 (1975), or an acknowledgment before a notary public, as provided by Ala.Code § 35–4–23 (1975). Ala.Code § 35–4–25

1. 3 Am.Jur.2d. §§ 191 and 195 (1961).

2. See Annotation, Sufficiency of execution of instrument by agent or attorney in fact in name of principal without his own name appearing, 96 A.L.R. 1251, 1255 (1935).

(1975) validates an acknowledgment of a conveyance to or by a corporation taken by a notary public who is not an officer of and owns not more than 1% of the capital stock of the corporation, but here the acknowledgment purported to be of K. Rush's execution of the assignment before Nell Rush, notary public, who "held" 94% of the capital stock of R.B.C. The inference to be drawn from the statute is that the acknowledgment is ineffective. This leaves the question of whether the assignment can be said to have been witnessed by Nell Rush, by virtue of her having signed it as notary public. Due to the questions which may arise from her being the assignee's principal stockholder and the manner in which the instrument was executed, the writer turns aside from this aspect and considers the other aspects of the purported assignment.

■ The words purporting to assign to R.B.C. the debtor's mortgage to K. Rush appear to be about the same as the effort to convey her interest in the land, but the March, 1987, instrument also purports to assign to R.B.C. "the note [sic] and indebtedness" which the mortgage secured. This aspect of the instrument is not an attempted "alienation of lands" governed by Ala. Code § 35-4-20 (1975). It is a purported assignment of the promissory notes and the debt evidenced thereby.

■ An assignment of the debt and of the promissory notes does not appear to be a matter regulated by Alabama statute, but the Alabama Uniform Commercial Code—Commercial Paper § 7-3-202(2) states that "[a]n indorsement must be written by or on behalf of the holder and on the instrument or on a paper so firmly affixed thereto as to become a part thereof." The first part of that statute provides among other things, that "[i]f the instrument is payable to order it is negotiated by delivery with any necessary indorsement...." In the present case, there is no evidence of endorsement of the notes, but there is no reason to impose upon a separate assignment of the debt and notes any greater degree of formality of execution than the statute imposes upon an endorsement of the notes.

■ In that article of the Alabama Commercial Code, Part 4 is titled "Liability of Parties," and § 7-3-401(2) thereunder provides that "[a] signature is made by use of any name, including any trade or assumed name, upon an instrument, or by any word or mark used in lieu of a written signature." Also in Part 4 is § 7-3-403(1) which provides that "[a] signature may be made by an agent or other representative, and his authority to make it may be established as in other cases of representation." Under these statutes, had a duly-authorized agent stamped her signature on these promissory notes, followed or preceded by delivery of the notes to R.B.C., there would have been an effective endorsement and negotiation in favor of R.B.C. *See Oquendo v. Federal Reserve Bank of New York*, 98 F.2d 708 (2d Cir.1938); *Kiekhoefer v. United States National Bank*, 2 Cal.2d 98, 39 P.2d 807 (1934) (*in banc*); *Flat Top National Bank v. Parsons*, 90 W.Va. 51, 110 S.E. 491 (1922). In addition to the provision previously mentioned, § 7-3-202(1) includes the following: "[n]egotiation is the transfer of an instrument in such form that the transferee becomes a holder." If the stamping of K. Rush's signature on the notes by a duly-authorized agent, followed or preceded by delivery to R.B.C., would constitute R.B.C. as the "holder" of the notes, there does not appear to be any sufficient reason why a similar application of her signature to an assignment of the debt and notes would not be legally sufficient.

■ That being so or not, counsel for K. Rush argue that her estranged husband could not exercise the power given him under her power of attorney so as to effect a transfer or assignment for which she received no present consideration or, put differently, was contrary to her best interests or which benefited him, at her expense. It is an obvious proposition that an agent who is authorized to act for a principal, under an ordinary power of attorney, owes a fiduciary duty to the principal not to exercise the power against the princi-

pal's interests and for those of the agent. *Miller v. Louisville & N. R.R.*, 83 Ala. 274, 4 So. 842 (1887). Further, it is held in Alabama that a power of attorney does not authorize a conveyance of the principal's real estate to an agent, unless there is an express authorization of both (1) conveyances of real estate and (2) conveyances to the agent. *Hall v. Cosby*, 288 Ala. 191, 258 So.2d 897 (1972); *Dillard v. Gill*, 231 Ala. 662, 166 So. 430 (1936). The distinction between these cases and the question of the assignment of the debt and notes—that the cases involved conveyances of real property—does not appear significant on the principles of agency involved.[3]

There are at least two other distinctions—of greater significance. In those cases, the property was conveyed to the principal's agent, but here the assignment was to R.B.C. The corporation was, however, owned by the agent to the extent of three percent of the stock, by his brother to the same extent, and by his mother to the extent of 94% of the stock. On the other hand, R.B.C. was the source of K. Rush's title to the real property whose sale produced the purchase-money debt and notes assigned.

Also, in those cases there was no indication in the powers of attorney that the parties contemplated an exercise of the power for the benefit of the agent and to the detriment of the principal or that such an exercise of the power was condoned. Here, the power of attorney from K. Rush provides that "[i]f at any time there should become a conflict between our two interests concerning financial or legal matters then his interest will come first and mine second." It appears that this is exactly what occurred.

■ K. Rush left her husband after he had threatened her with physical harm, and about a week later he executed on her behalf the assignment to R.B.C. of the debt and notes owed by the debtor. Her husband had some lingering doubt as to the legal sufficiency of the assignment and undertook to obtain from K. Rush an assignment physically executed by her but was

unsuccessful and later, from his jail cell, issued a second assignment which showed that he was acting as her agent and which bore a certificate by a different notary public. His doubt as to the legal sufficiency of the March, 1988, assignment did not prevent its being filed for record and is immaterial.

■ In the *Hall* and *Dillard* opinions, the Alabama Supreme Court observed that, had the wife in the case intended that her husband have her property, she could have given him her conveyance or deed instead of the power of attorney. But here, the power of attorney was given by K. Rush to her husband years before the assignment of the mortgage and had been utilized down to that time to cloak various business activities of his with K. Rush's identity. In the present case, the most likely explanation for the conveyance of the real estate by R.B.C. to K. Rush and its sale in her name, with the resulting notes being made payable to her, is that it furthered some scheme by K. Rush and her husband and his parents and brother to disguise the true ownership of, first, the property and, later, the promissory notes for $1,050,000. When K. Rush became estranged from her husband, the scheme put at peril the interests of the other Rushes in this significant debt, bringing into play the efforts to undo the concealment of this asset.

There appears little need to discuss at length the second purported assignment, for prior to its execution K. Rush had issued to legal counsel then retained by her a new power of attorney, which expressly revoked the 1981 power of attorney to her husband, and it had been filed for public record. If notice to her agent-husband of the revocation was necessary to the effectiveness of the termination of his authority, such notice was probably supplied by inferences to be drawn from his incarceration at her behest.

Further, there appears little need to discuss the "equitable" powers which this Court is said to possess under the much cited and discussed section 105(a) of title

---

**3.** The *Dillard* case involved transfers of personalty, as well as conveyances of real property.

11, United States Code. No exercise of an equitable power is necessary to sustain the ownership of R.B.C. of the debt and notes, under the March, 1988, assignment.

 To hold that their estrangement, commencing about a week before the execution of the assignment, revoked the power of attorney from K. Rush to her husband appears to require the application of some equitable doctrine of implied revocation. K. Rush, though, perhaps as she said, a "pawn," was a knowing participant with the other Rushes in these and similar devious transactions and may not now obtain some form of extraordinary relief from this Court. Where unclean hands have clasped and then become unjoined, the Court will leave what they now grasp as the Court finds it. Under such circumstances, the conscience of the Court is not pricked by a cry of "unjust enrichment" by either party. *See Carter v. Carter*, 282 Ala. 239, 210 So.2d 800, at 282 (1968). Besides, it would be an act of questionable precision for the Court to undertake a straightening out of this lengthy skein tied to events running back 15 to 20 years.

 In at least two instances, the Alabama Legislature has expressed its policy as to the effect of the transfer of debt secured by real property. Alabama Code § 8–5–24 (1975) (Effect of transfer of bill, note, etc., given for purchase money of lands.) states:

> The transfer of a bond, bill or note given for the purchase of lands, whether the transfer be by delivery merely or in writing, expressed to be with or without recourse on the transferor, passes to the transferee the lien of the vendor of the lands.

Alabama Code § 35–10–1 (1975) (Power of sale constitutes part of security; by whom executed; effect of conveyance; index of foreclosure deeds.) provides:

> Where a power to sell lands is given to the grantee in any mortgage, or other conveyance intended to secure the payment of money, the power is part of the security, and may be executed by any person, or the personal representative of any person who, by assignment or other-

wise, becomes entitled to the money thus secured; and a conveyance of the lands sold under such power of sale to the purchaser at the sale, executed by the mortgagee, any assignee or other person entitled to the money thus secured, his agent or attorney, or the auctioneer making the sale, vests the legal title thereto in such purchaser. Probate judges shall index foreclosure deeds by the names of the original grantor and grantee in the mortgage, and also by the names of the grantor and grantee in the foreclosure deeds.

Under these two statutes, R.B.C., being the assignee of the debt and notes which are secured by the debtor's tract of land, possesses the purchase-money lien on the land and holds the power of sale under the mortgage—sufficient to effect a foreclosure sale in the event of the debtor's default. The Court must decree that R.B.C. holds and owns the lien on the debtor's land, securing this debt, as evidenced by the mortgage notes. One aspect of the debtor's complaint must be taken as an alternate objection to these two bankruptcy case claims, and it must be overruled as to the claim of R.B.C. and sustained as to K. Rush. In accordance with the primary disclaimer of R.B.C. and of K. Rush, it must be ordered that R.B.C. has no other or different claim to the debtor's land and that K. Rush has none at all and may not further assert any. A final order conforming hereto will be entered.